[No. 38717.    En Banc.    November 17, 1966.]

WILLIAM KASPER, *Appellant,* v. THE CITY OF EDMONDS, *Respondent.*\*

*A. Wesley Hodge* (of *Hullin, Ehrlichman, Carroll & Roberts*), for appellant.

*James A. Murphy* (of *Ogden, Ogden & Murphy*), for respondent.

FINLEY, J.—The question for determination in the instant

\*Reported in 420 P.2d 346.

case and in a companion appeal, *Thymian v. Massart, post* p. 806, 420 P.2d 351 (1966), concerns the meaning of the words "total cost of the improvement" as they appear in the presently effective version of RCW 35.43.180, which provides for restraint of local improvement projects by protest of the owners of property within the proposed local improvement district. The problem is whether "total cost of the improvement" means the total cost of a project, including the amount proposed to be contributed from municipal funds, or whether it simply refers to the assessed cost as borne by the property owners whose property is specially benefited. Viewed from a slightly different vantage point, the basic issue is whether the legislature intended to allow a municipality to deprive property owners of their right of protest when the municipality involved proposes to provide, from one fund or another, more than 40 per cent of the amount required to finance the local improvement.

The case was heard on a stipulated set of facts. The city of Edmonds, by ordinance No. 1092, ordered the improvement of Ninth Avenue from Main Street to Casper Street in Edmonds, and thereby created Local Improvement District No. 131 (hereinafter referred to as LID 131). The project cost for the proposed LID 131 was estimated at $112,000. Of that amount, $52,661 was to be assessed against the property owners. The balance of $59,339 was to be paid from the respondent city's Arterial Street Fund, if available; otherwise, from the Street Department Fund. Appellant and other property owners to be affected filed timely protests with the city of Edmonds in accordance with the provisions of RCW 35.43.180. These protests represented 88.1 per cent of that part of the cost of the project which was to be assessed against and borne by the property owners. The city ignored the protests, and proceeded with the formation of LID 131. Appellant Kasper brought this action as a representative of a class of similarly situated property owners seeking a writ of prohibition to restrain the respondent city from further proceedings on LID 131. The trial court dismissed appellant's petition, from which judgment this appeal followed.

The statute involved, RCW 35.43.180, presently and at all times pertinent here, reads as follows, with the words added by a 1957 amendment (Laws of 1957, ch. 144, § 12) in italics, and the portion added by a 1963 amendment (Laws of 1963, ch. 56, § 2), in brackets:

Restraint by protest. The jurisdiction of the legislative authority of a city or town to proceed with any local improvement initiated by resolution shall be divested by a protest filed with the city or town council within thirty days from the date of passage of the ordinance ordering the improvement, signed by the owners of the property within the proposed local improvement district subject to sixty percent or more of the *total* cost of the improvement *including federally-owned or other nonassessable property* as shown and determined by the preliminary estimates and assessment roll of the proposed improvement district [or, if all or part of the local improvement district lies outside of the city or town, such jurisdiction shall be divested by a protest filed in the same manner and signed by the owners of property which is within the proposed local improvement district but outside the boundaries of the city or town, and which is subject to sixty percent or more of that part of the total cost of the improvement allocable to property within the proposed local improvement district but outside the boundaries of the city or town, including federally-owned or other nonassessable property:  . . . . ]

The respondent city argues that "total cost of the improvement" clearly means just what it says; i.e., the total cost of the entire project regardless of the source of funds.[1] If the respondent was correct, however, "including federally-owned or other nonassessable property" would be mere surplusage, as any percentage of the cost allocable to such property would necessarily already have been included in "total cost." If, however, "total cost" means assessed cost, as appellant argues, some meaning at least can be assigned

[1] Professor Trautman, in his article, Trautman, *Assessments in Washington,* 40 Wash. L. Rev. 100, 115 (1965), devotes a paragraph and a footnote to discussion of RCW 35.43.180. He apparently interpreted the statute as does respondent. He largely restates the words of the statute, however, and does not appear to have considered the particular problem involved here.

to "including federally-owned or other nonassessable property." In that case, the phrase would mean that the required 60 per cent figure would have to be computed on the basis of all the theoretically assessable property, rather than on just the actually assessable property; and in certain cases such a formulation would make a considerable difference. Further it should be noted that the statute refers to "total cost . . . . as shown and determined by the preliminary estimates and assessment roll of the proposed improvement district . . . . " If total project cost was meant, there would seem to be no reason to refer to the assessment roll, and, more particularly, no reason to speak of estimates in the plural, thus perhaps indicating the estimates which are mailed to property owners, estimating their assessments, when reference to an estimate in the singular would have more accurately portrayed the basis for determining entire project cost. While it may well be somewhat true that "ambiguity lies only in the eye of the beholder," it seems patent that the protest statute is ambiguous in and of itself. Indeed the respondent seems almost to concede that in the very least the statute is ambiguous since so much of its brief is devoted to attempting to establish a proper construction of the statute.[2]

It thus becomes the duty of the court to determine the legislature's intention in making the 1957 amendment set forth above. Clearly the purpose behind the basic statute is to provide property owners with some control over public officials through a right to protest and thereby refuse to pay for local improvements. If the city is right in its interpretation of the statute, the right of protest has become almost illusory, as a municipality can effectively destroy the possibility of protest by proposing to allocate at least 40 per cent of the cost of an improvement to public funds;

[2]Respondent relies in part for its interpretation of the statute on an opinion by the Attorney General, AGO 61-62, No. 109 (1962). The cited opinion makes the preliminary statement that "total cost of the improvement" has been "a source of dispute in several cities and has not been accorded a uniform interpretation," and continues, "We shall therefore proceed under the premise that the phrase is ambiguous."

just as the city of Edmonds did in the present case. The respondent city argues that the 1957 amendment was merely an additional step in a legislative program over the years to limit the right of protest and to make improvement projects easier for cities and towns. See Laws of 1923, ch. 135, § 1; Laws of 1957, ch. 144, § 12; Laws of 1965, ch. 7, § 35.43-.180. We think, however, that the pattern of limiting the right has been something less than consistent. See Laws of 1963, ch. 56, § 2. The respondent also emphasizes the proposition that a complete denial of the right of protest is not objectionable on constitutional grounds. 13 McQuillin, Municipal Corporations § 37.52, at 190 (3d ed. 1949).[3]

Even granting the validity of these last two arguments by respondent, we think the important point to be that the legislature *has* granted the significant right of protest to property owners. If respondent's proposed interpretation prevails, cities and towns have complete, unbridled discretion as to whether a right of protest exists or not. As respondent has pointed out, sections 080, 110, 140, and 190 of RCW 35.43 all make it clear that a municipality can assess *"in whole or in part"* to property owners any part of a proposed improvement it sees fit (respondent's italics). RCW 35.43.200, RCW 35.43.170, and RCW 35.44.020 are much to the same effect. It seems very unlikely that the legislature would put the power to prohibit protests completely in the unguided discretion of cities and towns. The right of protest is the property owners' limitation on a municipality's power of assessment;[4] in the absence of a clear statement, should a municipality be allowed to control its own limitations?

[3]The author of the cited work, however, cites cases from 27 states which recognize some type of protest right. 13 McQuillin, Municipal Corporations §§ 37.52-37.55 (3d ed. 1949).

[4]Another court considering a different question under a different protest statute recently made an observation which nevertheless seems relevant here: "Since there is a direct correlation between the protest statute and the assessment statute, the protests must be considered on the same basis as the assessments are made." *Smith v. City of Bozeman,* 144 Mont. 528, 398 P.2d 462, 466 (1965). The holding in *Smith* may be said to stand for the proposition that a right of protest, once given, will be construed so that a city cannot easily deprive property owners of it.

Adopting the respondent's version of the protest statute would place this court in the peculiar and awkward position of judicially sterilizing the major portion of RCW 35-.43.180. The right of protest would become practically a meaningless right. Courts will not ascribe to the legislature a vain act, and " . . . . a statute should, if possible, be so construed that no clause, sentence or word shall be superfluous, void, or insignificant." *Groves v. Meyers*, 35 Wn.2d 403, 407, 213 P.2d 483, 486 (1950). It seems, then, more likely that the legislature's intent in enacting the 1957 amendment was merely to insure in a simple manner that nonassessable property was included in the calculations to determine the percentage necessary for a protest.

■ Appellant vigorously contends that if respondent's interpretation of "total cost" is adopted the statute, with the 1963 amendment, violates art. 1, § 12, of the Washington Constitution by giving property owners outside city limits a statutory procedural protection which those within city limits do not have. Appellant cites *Kelleher v. Minshull*, 11 Wn.2d 380, 119 P.2d 302 (1941), for the proposition that a classification to be constitutional must be reasonable and have a fair basis and not be arbitrary, unreasonable, or unjust. *Faxe v. Grandview*, 48 Wn.2d 342, 294 P.2d 402 (1956), a case cited by respondent which held that a city could charge higher water rates to persons residing outside city limits, does not seem to be telling to appellant's argument since many factual differences could obviously exist between the determination of water rates to users in different areas and the determination of who shall get a right of protest. On the other hand, an argument could be made that a valid basis for distinction in the granting of the right of protest exists between those within city limits who elect local officials and those outside city limits who do not exercise such control. We find it unnecessary, however, to reach the constitutional question. We merely note that the 1963 amendment to RCW 35.43.180 shows legislative awareness of the significance of the right to protest and thus reinforces our conclusion that the right should not be abrogated, once the legislature has granted it, except by legis-

lative mandate which is much more explicit than the 1957 amendment before us.

Respondent has brought to our attention an opinion by the Attorney General, AGO 61-62, No. 109 (1962), in which it is concluded that "total cost of the improvement," as used in RCW 35.43.180, includes money contributed by a city to an improvement project. In the cited opinion, construction of RCW 35.43.180 was based primarily upon reference to RCW 35.43.160 and RCW 35.43.130. In RCW 35.43.160 the legislature more clearly expressed that in restraining an improvement initiated by petition the cost involved was that which was to be assessed against property owners in the proposed district. In RCW 35.43.130 "cost and expense of the proposed improvement" is treated as something different from that portion of the cost to be borne by property owners. As to the reference to RCW 35.43.160, the answer is that there is no doubt that the legislature could have expressed itself more clearly than it did; but it is precisely because the protest statute is ambiguous, as the Attorney General's opinion seems to concede, that we must engage in our own construction of it. As to RCW 35.43.130, examination shows that it refers to *an* estimate, in the singular, of the cost and expense of the proposed improvement, thereby supporting the construction advocated by appellant equally as well as that favored by the Attorney General and respondent. It may be further appropriate to note here that everyone seems to concede that, from the time of our decision in *Hapgood v. Seattle,* 69 Wash. 497, 125 Pac. 965 (1912), until a year or two *after* the 1957 amendment to RCW 35.43.180 became law, it was generally and logically assumed that "cost of the improvement" meant cost to the property owners.

■ It is unnecessary, of course, to cite authority for the proposition that interpretations of state statutes by the Attorney General are entitled to considerable weight. In several previous instances, though, we have felt constrained by reason, legislative history, or other rules of statutory construction to decline to follow an Attorney General's opinion. *Huntworth v. Tanner,* 87 Wash. 670, 152 Pac. 523 (1915);

*State ex rel. Bonsall v. Case,* 172 Wash. 243, 19 P.2d 927 (1933); *Ernst v. Kootros,* 196 Wash. 138, 82 P.2d 126 (1938); *State ex rel. Blume v. Yelle,* 52 Wn.2d 158, 324 P.2d 247 (1958). We think such a situation is presented by the instant case for the reasons which have been discussed above.

The writ should be granted. Accordingly, the judgment of the trial court is reversed, and the case is remanded for proceedings consistent with this opinion.

ROSELLINI, C. J., HILL, DONWORTH, WEAVER, HUNTER, HAMILTON, and HALE, JJ., and BARNETT, J. Pro Tem., concur.