[No. 47164–9. En Banc. December 24, 1981.]

WASHINGTON EDUCATION ASSOCIATION, ET AL,
*Appellants,* v. ORIN SMITH,
ET AL, *Respondents.*

*Watson, Grosse & Feinstein,* by *C. Kenneth Grosse* and *Ronald E. Farley,* for appellants Washington Education Association, et al.

*Audrey B. Eide,* for appellant Washington Public Employees Association.

*Kenneth O. Eikenberry, Attorney General,* and *Robert F. Hauth* and *Richard M. Montecucco, Senior Assistants,* for respondents.

DIMMICK, J.—This action for a declaratory judgment is to

determine whether the state budget director is authorized to permit voluntary payroll deductions for employees for the purpose of making direct contributions to the political action committee of the employees' labor associations. The trial court granted the State's cross motion for summary judgment holding there was no statutory authority for such a deduction nor any constitutional right for the political action committees to receive state funds from wages of the employees, nor any right for the employees to have their wages paid to someone other than themselves. We affirm.

Appellant Washington Education Association (WEA) is an employee association representing teachers and other state workers. Appellant Washington Education Association/Association for Higher Education (WEA/AHE) is an affiliate of the WEA and represents the various local associations for higher education in the state. Appellant Washington Public Employees Association (WPEA) represents public employees including 4,000 state government workers and nonacademic staff at community colleges. Each has established a political action committee to endorse and support candidates for public office. The WEA's political action committee, "Political Unity of Leaders in State Education" (PULSE), is comprised of teachers and educators. "Political Action by Concerned Employees" (PACE), the WPEA's political action committee, consists of state and other public employees and their families, as well as interested parties. The funds collected by the two political action groups are used to support candidates for public office, in state as well as in federal elections. In addition, PULSE funds are given to the National Education Association's political committee.

These political action committees had received a large proportion of their funds by way of voluntary payroll deductions by their members. Some associations of college educators had this procedure written into their collective bargaining agreements.[1] The PULSE membership fee is

---

[1] These associations included the Wenatchee Valley College Association for

$10 per year. PACE requires a minimum contribution of $10 per year. A 7-step process is involved in payroll deductions. As of January 1980, there were 76,874 state employees in 128 different agencies. Each payroll deduction represents additional cost to the State. The main personnel/payroll system has a maximum capability of handling 10 deductions per individual. It is therefore possible that the addition of 1 more deduction for political contributions would cause some employees to exceed this maximum.

In 1978, Orin Smith, Director of the Office of Fiscal Management, requested an Attorney General opinion regarding the statutory authority, or constitutional requirement for these deductions. The Attorney General opinion concluded that the respondent director[2] had no statutory authority to permit a state employee to establish a payroll deduction for the specified purpose of making a voluntary contribution to a labor union or other employee organization for political purposes. Attorney General Opinion, Oct. 26, 1978. As a result, the director terminated these payroll deductions. In response, the appellants filed this suit for declaratory and injunctive relief on stipulated facts and affidavits.

I

Appellants' major contention is that voluntary payroll deductions for political contributions by state employees are "clearly related to state employment" and therefore may be authorized by the budget director exercising his discretion pursuant to RCW 41.04.

RCW 41.04.230 authorizes state disbursing officials to deduct money from the salaries and wages of public officers or employees. Specifically, this statute permits deductions for (1) credit unions, (2) parking fees, (3) United States

Higher Education and the Skagit Valley College Association for Higher Education, who are also appellants in the instant case.

[2]Other respondents include the Office of Fiscal Management, Wenatchee Valley Community College, and Skagit Valley Community College.

savings bonds, (4) board, lodging or uniforms, (5) membership dues to any professional organization formed primarily for public employees or college and university professors, (6) other labor or employee organization dues, (7) accident and casualty premiums, and (8) certain other insurance contributions. *See also* RCW 41.04.036 (permitting deductions for United Fund); RCW 41.04.233 (permitting deductions for health maintenance organizations).

In addition, RCW 41.04.230 contains a general provision permitting deductions for activities "clearly related to state employment" which reads in pertinent part:

> Deductions from salaries and wages of public officers and employees other than those enumerated in this section or by other law, may be authorized by the director of financial management *for purposes clearly related to state employment or goals and objectives of the agency* . . .

(Italics ours.)

The thrust of appellants' argument is that these deductions are for "purposes clearly related to state employment", and, therefore, come within the general provision as political activity is an essential element of state employment. Appellants note that since state employees' working conditions are in part established by the legislature, the employees are at the mercy of the political process. Thus, voluntary political contributions are necessary to insure that employees have some voice in the establishment of working conditions. We do not find this argument persuasive.[3]

First, it is unclear whether these contributions directly impact the employees' bargaining position. There is no guaranty that either PULSE or PACE will spend these funds exclusively on state elections. In fact, some of the

---

[3]In fact, union dues may be used to finance legislative lobbying, collective bargaining, and other political activity, as long as each employee is afforded the opportunity to refuse to contribute to a specific activity. *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 52 L. Ed. 2d 261, 97 S. Ct. 1782 (1977); *Association of Capitol Powerhouse Eng'rs v. State*, 89 Wn.2d 177, 188–89, 570 P.2d 1042 (1977).

funds are contributed to candidates for federal offices who have little, if anything, to do with establishing wages, hours and conditions of employment for Washington state employees. Further, the interests of the members are diverse in that the associations are comprised of public employees and their families as well as state employees and "others".

Second, we can find nothing in the legislative history of the act indicating that the legislature intended to permit deductions for political purposes. In other legislation, the legislature has expressed its disapproval of using state property in connection with the solicitation or making of political contributions. *See* RCW 41.06.250(1) (prohibiting the solicitation on public property of political or partisan contributions); RCW 42.17.130 (prohibiting the use of any facilities of a public office or agency, directly or indirectly, for campaign purposes).

Finally, the opinion of the Attorney General concludes that these political contributions are not authorized. Attorney General Opinion, Oct. 26, 1978. Although not binding, opinions of the Attorney General in construing statutes are entitled to considerable weight. *In re Chi–Dooh Li,* 79 Wn.2d 561, 488 P.2d 259 (1971); *Kasper v. Edmonds,* 69 Wn.2d 799, 420 P.2d 346 (1966). This is especially true in the instant case given the legislature's acquiescence to the Attorney General's interpretation of RCW 41.04.230 as evidenced by its failure, in subsequent legislative sessions, to modify the statute.[4] *See White v. State,* 49 Wn.2d 716, 306 P.2d 230, *appeal dismissed,* 355 U.S. 10, 2 L. Ed. 2d 21, 78 S. Ct. 23 (1957); *State ex rel. Pirak v. Schoettler,* 45 Wn.2d 367, 274 P.2d 852 (1954).

There being no specific provision for such deductions within the statutes of the state, the problems of fiscal impact and the strict adherence of the legislature to refrain

---

[4]At oral argument, counsel for Washington Education Association (WEA) stated that WEA had tried, unsuccessfully, to have RCW 41.04.230 amended to specifically permit deductions for political action committees.

from participation by the State in partisan politics, lead us to the conclusion that the legislature did not intend to include political contributions within the limited general classification of activity "clearly related" to state employment. If there is a fair or reasonable doubt as to whether or not a particular power has been granted, it must be denied. *Pacific First Fed. Sav. & Loan Ass'n v. Pierce County,* 27 Wn.2d 347, 178 P.2d 351 (1947); *Griggs v. Port of Tacoma,* 150 Wash. 402, 273 P. 521 (1928). Therefore, we hold the director does not have discretionary power in this case.

## II

Appellants next assert that if RCW 41.04 does not permit voluntary payroll deductions for political contributions, it is violative of the First Amendment rights of political association and speech. They argue that not allowing the payroll deduction "becomes a limitation on political contributions and expenditures and therefore a regulation of speech" in direct conflict with *Buckley v. Valeo,* 424 U.S. 1, 46 L. Ed. 2d 659, 96 S. Ct. 612 (1976). Such a prohibition also "takes away from public employees their First Amendment right to political speech and association as a condition of their employment," in violation of *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 52 L. Ed. 2d 261, 97 S. Ct. 1782 (1977). These arguments, however, ignore the fact that state workers are not prohibited entirely from contributing to the political action committees. Rather, only one method of facilitating contributions is prohibited. Thus, the federal constitution does not require the State to make this type of deduction.

Certainly, contributing to an organization for the purpose of spreading a political message is protected by the First Amendment. *See Abood* (holding that a mandatory state–employee union could not use union dues for political or ideological causes without the consent of the members individually); *Buckley v. Valeo, supra* (a very divided Supreme Court holding that while federal limitations on political contributions and disclosure requirements were constitutional, expenditure limitations were not). *See also*

*Charlotte v. Local 660, Int'l Ass'n of Firefighters,* 426 U.S. 283, 48 L. Ed. 2d 636, 96 S. Ct. 2036 (1976) (holding that the City did not violate equal protection guaranties by refusing to withhold union dues when a rational basis (administrative convenience) could be perceived). Yet, the protection afforded by the First Amendment is not necessarily extended to tangential infringements such as are involved in the instant case. Just as "[t]he right to speak and publish does not carry with it the unrestrained right to gather information", *Zemel v. Rusk,* 381 U.S. 1, 17, 14 L. Ed. 2d 179, 85 S. Ct. 1271 (1965), the right to make political contributions does not necessarily include the right to compel the State to deduct the contributions from one's paycheck.

A decision by the Federal District Court for the Eastern District of Virginia is on point. In *Local 995, Int'l Ass'n of Firefighters v. Richmond,* 415 F. Supp. 325 (E.D. Va. 1976), the district court held that the City's refusal to withhold union dues from the wages of firefighters, and to transfer those funds to the union treasury, was not constitutionally mandated:

> Failure of the City to provide "check–offs" does not in this Court's view significantly impair the union's ability to organize and provide services for its members.
> Furthermore, while the First Amendment protects the right of American citizens to freely associate, it was never intended to provide an affirmative weapon in forcing the state to aid union organizational activities. While a state may be prohibited from penalizing or restricting union activities, the First Amendment imposes no duty on the state to provide services or engage in policies that will affirmatively assist a union to carry out its function and purpose. It follows, therefore, that even if it can be said that the City's refusal to provide check–offs effects [*sic*] the union's ability to organize, no constitutional rights of the plaintiffs are being infringed.

(Citations omitted.) *Local 995,* at 326. Similarly, in the instant case, even if the State's refusal to deduct for political contributions impairs the union's ability to take politi-

cal action, none of appellants' constitutional rights are involved. There are many other methods of soliciting contributions, foremost of which is mail solicitation.

### III

Appellants also allege that prohibiting payroll deductions for political action committees for community college teachers and other state employees while permitting these deductions for employees of common schools is violative of the equal protection clause of the Fourteenth Amendment. RCW 28A.67.095 allows disbursing officials authorized to pay the salaries and wages of certificated employees of school districts to make *any* deductions authorized by those employees if 10 percent so request, subject to the limitations of district equipment and personnel. Thus, some teachers in grades K through 12 have their contributions to political action committees deducted automatically from their paychecks. Appellants assert that this disparate treatment of teachers, based solely on the educational level they teach, is so arbitrary and unreasonable that it violates the equal protection guaranty.

■■ The burden of proving that the classification is arbitrary and unreasonable rests upon the party assailing the classification. *State School Directors Ass'n v. Department of Labor & Indus.*, 82 Wn.2d 367, 376–77, 510 P.2d 818 (1973); *State v. Persinger*, 62 Wn.2d 362, 368–69, 382 P.2d 497 (1963). Appellants, however, are unable to meet this burden. Community college teachers and common schoolteachers are two very distinct classes of employees; the former are paid and administered by the State, whereas the latter are paid and administered by the school districts. These two groups are often treated differently. RCW Title 28A deals in its entirety with special provisions for common schools; RCW Title 41 deals with state employment. As an example, teachers in common schools are not given the "floating holiday" that other state employees are granted. *Prante v. Kent School Dist.*, 27 Wn. App. 375, 618 P.2d 521 (1980). Moreover, the State's fiscal and payroll manage-

ment is vastly more complex than that of any of the separate and semiautonomous school districts due to the far greater number of employees working in separate agencies all under the payroll supervision of one office. In fact, their only common characteristic is that they are both "public teachers".

## IV

■ Appellants next contend that respondents are estopped from contesting the collective bargaining agreements between the respondent community college districts and appellant education associations which provide for payroll deductions for political action committee contributions. We have held that the State can be estopped where the other party has acted to his or her detriment in reliance upon the State's commitment. *State ex rel. Shannon v. Sponburgh,* 66 Wn.2d 135, 401 P.2d 635 (1965). The doctrine of estoppel, however, is only applied to prevent manifest injustice. *Finch v. Matthews,* 74 Wn.2d 161, 443 P.2d 833 (1968). Most importantly, estoppel will not be applied against a governmental body whose acts are ultra vires and void. *Finch v. Matthews, supra; Arbogast v. Westport,* 18 Wn. App. 4, 567 P.2d 244 (1977); *Fitzgerald v. Neves, Inc.,* 15 Wn. App. 421, 550 P.2d 52 (1976).

Appellants' estoppel argument, therefore, is dependent upon the authority of the respondent districts to agree to the payroll deductions involved herein, which in turn is dependent upon our interpretation of RCW 41.04.230. Since we hold today that the statute does not permit the deductions, and that the United States Constitution does not require them, we find that the contract was ultra vires. Therefore, the respondent is not bound. *See Finch.*

## V

■ Lastly, appellants contend that if RCW 41.04.230 does not permit political action payroll deductions, it is in conflict with and therefore preempted by 2 U.S.C. §§ 431–56 (1976) (Federal Election Campaigns Act (FECA)). This argument fails for two reasons. First, that act affects *fed-*

*eral* elections only. 2 U.S.C. §§ 431, 453. State law still governs state elections. *Cf. Cort v. Ash,* 422 U.S. 66, 45 L. Ed. 2d 26, 95 S. Ct. 2080 (1975) (holding that if state law permits contributions in state elections which would violate the federal act if made in a federal election, federal law provides no remedy). In the instant case, appellants make no claim of being substantially involved in federal elections.

Second, there is nothing in the FECA that requires any employer to establish a payroll deduction plan for its own employees. Appellants' reference to 2 U.S.C. § 441b(b)(5) is inapposite, for this provision merely states that a corporation must establish a payroll deduction plan for voluntary contributions by union employees *if* it has such a plan for stockholders and executive or administrative personnel. Otherwise, such a payroll deduction plan is not required. See the FECA regulations at 11 C.F.R. § 114.5(k)(4) (1981).

The legislature is the proper body to determine the practicalities of expanding the list of payroll deductions. Since, at the present time, contributions for political activities are neither permitted by statute, nor required by the constitution, we affirm the trial court.

BRACHTENBACH, C.J., and STAFFORD, UTTER,. DOLLIVER, and HICKS, JJ., concur.

DORE, J. (dissenting)—I dissent because I find payroll deductions for political activities by state employees are clearly related to their employment and, therefore, I would authorize employee payroll deductions for union contributions. The majority holds that the activities for which employee deductions are contributed do not impact the employees' bargaining position. I disagree.

RCW 41.04.230 provides:

> Deductions from salaries and wages of public officers and employees *other than those enumerated in this section or by other law, may be authorized by the director of financial management for purposes clearly related to state employment or goals and objectives of the agency.*
> . . .

(Italics mine.)

The primary role of the court in construing this statute is to determine the intent of the legislature, and to give effect to that intent. *Burlington N., Inc. v. Johnston,* 89 Wn.2d 321, 572 P.2d 1085 (1977). To this end, the statute must be read as a whole; intent is not to be determined by a single sentence (or, in this case, the single phrase "clearly related to state employment"). *State v. Fenter,* 89 Wn.2d 57, 569 P.2d 67 (1977). RCW 41.04.230 provides specifically for payroll deductions for credit unions, parking fees, United States savings bonds, board, lodging and uniform fees, professional and union dues, accident and casualty premiums, insurance contributions and health maintenance payments. The legislature also provided for any payroll deductions for purposes "clearly related to state employment or goals and objectives of the agency".

The majority used a vacuum of legislative history as affirmative evidence that the legislature intended to prohibit deductions for political purposes. In my opinion, this analysis is totally unjustified. Footnote 3 of the majority opinion, on page 605, specifically notes that union dues may be used to finance legislative lobbying, collective bargaining and other political activity, as long as each employee is afforded the opportunity to refuse to contribute to a specific activity.[5] *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 52 L. Ed. 2d 261, 97 S. Ct. 1782 (1977); *Association of Capitol Powerhouse Eng'rs v. State,* 89 Wn.2d 177, 188–89, 570 P.2d 1042 (1977). The majority's contention that political deductions should not be allowed because there is no *specific* provision for their deductions is unfounded. The legislature provided for payroll deductions to be added later with its "catchall" provision, RCW 41.04.230. The history of the legislation does not indicate that deductions for political purposes are excluded. I would argue that on this

---

[5]Neither party denies that these payroll deductions to political action groups are entirely voluntary, and the individual employee is free to refuse authorization of this deduction.

record political contributions are more related to state government than the specifically enumerated allowances for United States savings bonds, charitable organizations, and accident and casualty premiums.

The majority at page 608 sees the invasion of the union members' First Amendment rights of association and free speech as mere "tangential infringements". Yet, without the allowance of payroll deductions for these political activity funds, teacher unions and their associated political action groups will be restricted in securing minimum benefits for their members. The majority cites *Local 995, Int'l Ass'n of Firefighters v. Richmond*, 415 F. Supp. 325 (E.D. Va. 1976) as legal authority for its position. In *Richmond*, however, the court found that the absence of "check-offs" did not significantly impair the union's ability to organize and provide services for its members because there were viable alternative methods available. This is simply not true in the present case. Affidavits show that physical solicitations at employee work sites or on state property are prohibited. Admittedly it is extremely difficult, if not impossible, to coordinate solicitation and receipt of cash contributions in a manner wherein members do not have easy access to union representatives. Affidavits further show that direct mail solicitation has proved ineffective and costly. Pleas in monthly newsletters are a waste of money. Alternative methods to the payroll deduction system are ineffective.[6] The importance of the payroll deduction method to the participation of teachers in these political action groups is illustrated by the immediate reduction of membership upon the discontinuation of payroll deductions.[7] The majority fails to recognize the realistic

---

[6]See Affidavit of Michael Sayan, Clerk's Papers, at 40–42; Affidavit of Carol Coe, Clerk's Papers, at 43–45.

[7]During the 1977–78 year, in which payroll deductions were allowed, PULSE boasted a total of 905 members. When the payroll deductions were discontinued late in 1978, PULSE membership dropped to 801 for the 1978–79 year. And during the 1979–80 year, PULSE membership dropped to an all-time low of 124 members.

result of not allowing these payroll deductions: without this method of contribution, the survival of these political action organizations is threatened and state employees' rights to freely associate and speak regarding their employment concerns and needs will be lessened.

The majority claims that teacher payroll deductions are not *clearly related* to state employment because there is no guaranty that the funds will be spent exclusively on state elections. The language of RCW 41.04.230, however, requires only *clear,* not *exclusive,* relation to state employment. It is true that some of the funds are contributed to candidates for federal offices who have little to do with establishing teacher employment terms. The majority of the money withheld, however, is used to finance legislative lobbying, collective bargaining and political activities designed to further political impact of the involved unions.

The majority mistakenly relies upon the opinion of the Attorney General, which concludes that teacher political deductions are unauthorized. Attorney General Opinion, Oct. 26, 1978. Attorney General opinions should be considered when interpreting an ambiguous statute. *Bradley v. Department of Labor & Indus.,* 52 Wn.2d 780, 329 P.2d 196 (1958). But such an opinion is not controlling, and this court has frequently declined to follow opinions of the Attorney General. *Kasper v. Edmonds,* 69 Wn.2d 799, 420 P.2d 346 (1966) and cases cited therein; *Davis v. County of King,* 77 Wn.2d 930, 468 P.2d 679 (1970). The subject Attorney General opinion is conclusory on the issue of whether political deductions are related to state employment, stating at page 8:

> [T]o the extent that state property may be used at all in connection with the solicitation or making of political contributions, it is hedged with very careful restraints. See, for instance, RCW 42.17.130 [forbids use of public offices and agency facilities in political campaigns]; also, RCW 41.06.250(1) [forbids compulsory assessments or involuntary political contributions and prohibits solicitation on state property for partisan, political purposes].

> Accordingly, while payroll deductions for political contributions might not clearly *conflict* with either of those expressed purposes, we can find no basis for holding that this type of deduction would satisfy the express statutory requirement that it must be "clearly related."

The statutes cited are not applicable. The opinion admits that teacher payroll deductions do not conflict with the general provision statute. In the absence of any affirmative rationale for denying payroll deductions for political union activities, the Attorney General opinion is of little value.

In recent days, this court has denied a state school request for a temporary injunction to prevent a wholesale 10.1 percent reduction of common school appropriations.[8] Teachers claim that the 1981–83 appropriations for schools constitute minimum support for "basic education" of our children throughout the state. They argue that if a cut of such magnitude is effectuated, hundreds of teachers will become unemployed. A special session of the legislature has been called to address our economic situation including the threatened cut in school funding. It is clear that if the subject payroll deductions had been in effect for the past 2 years, these funds would now be available to use as a public relations mechanism to disseminate information as to what impact these suggested school cuts will have on basic education and the number of teachers that will be terminated in the event large cuts are mandated. Such monies also could be made available to hire lobbyists, for travel and expense money for teachers to go to the special session and converse with legislators, and for political contributions to individual legislators.

This unexpected and dramatic calling of the special session highlights the importance of these political contributions and how closely they are related to state government and the continued employment and welfare of teachers.

---

[8]The constitutionality of pending 1981–82 school appropriation cuts is currently before this court in the case of Seattle School District No. 1 of King County v. State, cause No. 47947-0.

The majority states at page 607 that "the legislature did not intend to include political contributions within the limited general classification of activity 'clearly related' to state employment". The pending school crisis strongly emphasizes the degree to which these payroll deductions are related to their status as state employees.

CONCLUSION

The majority's denial of payroll deductions will seriously restrict the ability of our teachers to actively participate in the political process which determines their working conditions. In addition, its decision continues to mandate a drastic dwindling of teacher political action groups, as is illustrated by the sharp decline in membership already experienced.

I would hold that the language of RCW 41.04.230 permits payroll deductions for political purposes, including candidate contributions, by state teachers. I would reverse.

ROSELLINI and WILLIAMS, JJ., concur with DORE, J.

