[No. 5480-9-II. Division Two. June 10, 1983.]

THE DEPARTMENT OF REVENUE, *Respondent,* v. MARTIN AIR CONDITIONING AND FUEL COMPANY, INC., *Appellant.*

*Allan Munro,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *William B. Collins, Assistant,* for respondent.

PETRICH, C.J.—Martin Air Conditioning and Fuel Company, Inc., appeals from a superior court judgment reversing the decision of the Board of Tax Appeals (Board) before which Martin Air Conditioning and Fuel Co., Inc. (Martin) successfully contested a sales tax deficiency assessment. The Department of Revenue (Department) assessed a deficiency for 4 reporting years, 1975 through 1978. Martin paid the assessment, unsuccessfully petitioned the Department for a refund, then appealed to the Board. The Board did not reach the merits of the assessment, but instead decided the Department was estopped to assess the tax, and voided the tax assessment. The Department appealed. The trial court reversed, concluding that the Board had no authority to consider estoppel as a shield barring collection of the taxes and that the factual elements of estoppel were not present. Martin raises two issues on appeal:

1. Does the Board of Tax Appeals have the authority to consider estoppel as a bar to the collection of taxes?

2. Are the factual elements of estoppel present?

We have carefully studied the record and conclude that the elements of estoppel are not present. We do not reach the question of the Board of Tax Appeals' authority.

This appeal concerns the collection and payment of retail sales tax under RCW 82.08. Martin is in the business of selling heating oil at retail to residential and commercial customers. Periodically the customers would have no use for a portion of the purchased oil. This would most often occur when the customer moved. The sales tax at issue is related to the disposal of the remaining oil. Martin provided two services to its customers to facilitate the disposal of this oil. (1) When a residential or commercial customer would move, Martin, for a fee, would pump the remaining oil from the customer's tank and refund to the customer the pro rata portion of the purchase price and the pro rata portion of the sales tax. This service is labeled a "pump-out." (2) Alternatively, Martin would facilitate the sale of the unconsumed oil between the former occupant and new occupant. The former occupant was credited for the sales price and sales tax on the unconsumed oil, and the new occupant was charged. This second service is known as an "assumption." In the pumpout transaction, Martin reduced its reported tax liability in the amount of the refunded tax. In the assumptions, the sales tax collected from the new occupant was not remitted to the State.

For tax reporting purposes, Martin treated these transactions as a wash, *i.e.*, it netted its gross sales and the pumpout/assumptions, and on its tax return reported one total for gross sales instead of reporting its gross sales and taking a deduction for the sales tax returned. The evidence showed Martin followed this practice for 27 years, had been audited approximately 10 times, and that the practice had never been criticized by state auditors. Two officers of the lobbying/business organization, Oil Heat Institute of Washington, which has over 100 members, testified the

practice in question had been followed throughout the industry since sales taxes were enacted.

In effect, Martin took a deduction for a returned good without formally recognizing either transaction as goods returned. A returned good is an allowable deduction. WAC 458-20-108.[1] The Department took the position that neither the pumpout nor assumption was a returned good, and that it was improper to refund the sales tax to the old customer.[2] The Department argued that because of the reporting method it was never made aware of the practice and that failure to criticize was nothing more than mistake or oversight by state auditors and therefore, the Department should not be estopped from collecting the tax.

The Board of Tax Appeals reversed the Department concluding the Department was estopped from collecting the taxes. It found that Martin's practice of 27 years was a long-standing practice within the fuel industry which had been approved by the Department in 1971 during the course of an audit of an unrelated company, and that Martin and other oil dealers relied on past interpretations, audit reports, and instructions issued by the Department.

■ This being a review of an administrative agency action, we are initially concerned with the scope of review.

[1]WAC 458-20-108 provides in part:

"RETURNED GOODS. When sales are made either upon approval or upon a sale and return basis, and the purchaser returns the property purchased and the entire selling price is refunded or credited to the purchaser, the seller may deduct an amount equal to the selling price from gross proceeds of sales in computing tax liability, if the amount of sales tax previously collected from the buyer has been refunded by the seller to the buyer. If the property purchased is not returned within the guaranty period as established by contract or by customs of the trade, or if the full selling price is not refunded or credited to the purchaser, a presumption is raised that the property returned is not returned goods but is an exchange or a repurchase by the vendor."

[2]The Department argued in effect that it was a taxable event when the taxpayer sold oil to customer number 1, and a separate taxable event when it resold to customer number 2. By refunding the tax to customer number 1, tax was paid only once when, under the statutes and regulations, it should have been paid again on the resold oil.

Our review, like that of the superior court, is under RCW 34.04.130(6).[3] Factual questions associated with estoppel are at issue here. The clearly erroneous standard of review for factual questions governs. In *Franklin Cy. Sheriff's Office v. Sellers*, 97 Wn.2d 317, 324, 646 P.2d 113 (1982), the court discussed this standard:

The present test allows for greater judicial scrutiny of agency fact–finding as the reviewing court can declare a finding to be clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

(Citation omitted.) It is the duty of this reviewing court to "search the entire record for evidence both supportive of and contrary to the agency's findings", *Franklin Cy. Sheriff's Office v. Sellers*, 97 Wn.2d at 324, although we are precluded from substituting our judgment for that of the administrative agency. With this standard in mind, we turn to the issue of estoppel.

 Estoppel consists of three elements: (1) an admission, statement, or act inconsistent with a claim later asserted; (2) action by the other party on the faith of such admission, statement, or act; and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act. *Harbor Air*

---

[3]RCW 34.04.130(6) states:

The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(a) in violation of constitutional provisions; or

(b) in excess of the statutory authority or jurisdiction of the agency; or

(c) made upon unlawful procedure; or

(d) affected by other error of law; or

(e) clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or

(f) arbitrary or capricious.

At the Board level, the Department requested that the matter be heard as a formal hearing, the effect of which was that the case proceeded under the administrative procedure act. *See* RCW 82.03.190; RCW 34.04.150.

*Serv., Inc. v. Board of Tax Appeals,* 88 Wn.2d 359, 366–67, 560 P.2d 1145 (1977). The State can be estopped where a party has acted to his or her detriment in reliance upon the State's commitment, although the State cannot be estopped because of unauthorized admissions, conduct, or acts of its officers. Estoppel will not lightly be invoked against the State to deprive it of the power to collect taxes. *See generally, Washington Educ. Ass'n v. Smith,* 96 Wn.2d 601, 638 P.2d 77 (1981); *Kitsap–Mason Dairymen's Ass'n v. State Tax Comm'n,* 77 Wn.2d 812, 818, 467 P.2d 312 (1970); *Finch v. Matthews,* 74 Wn.2d 161, 443 P.2d 833 (1968); *Wasem's, Inc. v. State,* 63 Wn.2d 67, 385 P.2d 530 (1963); *Whatcom Cy. Water Dist. 4 v. Century Holdings, Ltd.,* 29 Wn. App. 207, 627 P.2d 1010 (1981); Comment, *Estoppel and Government,* 14 Gonz. L. Rev. 597, 610–19 (1979).

■ *Kitsap–Mason Dairymen's Ass'n v. State Tax Comm'n, supra,* is an example of these principles. There, the taxpayer's handling of cash discounts resulted in the taxpayer collecting more sales tax than was actually remitted to the Department. The court upheld a tax deficiency assessment when the auditors discovered the error which had been overlooked by auditors for 15 years through ignorance, neglect, or inadvertence. The court distinguished an oversight from a change in interpretation of a statute or rule.

Federal cases addressing estoppel against the Internal Revenue Service provide additional guidance. In *Automobile Club v. Commissioner,* 353 U.S. 180, 183, 1 L. Ed. 2d 746, 77 S. Ct. 707 (1957), the Court held that equitable estoppel is not a bar to the correction by the Commissioner of a mistake of law. In *Union Equity Coop. Exch. v. Commissioner,* 481 F.2d 812 (10th Cir. 1973), the taxpayer engaged in an accounting practice for 13 years which had never been questioned even though his returns had been audited. In the 14th year, the IRS assessed a deficiency. The court rejected the taxpayer's estoppel argument holding:

It is true that the doctrine of consistency or quasi-estoppel has on occasion been applied to prevent an injustice, but such has been done generally where there has been fraud or unfair conduct on the part of the Commissioner, with some degree of reliance thereon by the taxpayer to the latter's detriment. None of these aspects are present in the instant case.

And to the contrary, it is well established that the Commissioner is not estopped from challenging erroneously reported items where Internal Revenue agents have failed in prior years to challenge similarly erroneously reported items.

*Union Equity Coop. Exch. v. Commissioner,* 481 F.2d at 817. *See also Travis v. Commissioner,* 406 F.2d 987 (6th Cir. 1969); *Easter v. Commissioner,* 338 F.2d 968 (4th Cir. 1964), *cert. denied,* 381 U.S. 912, 14 L. Ed. 2d 433, 85 S. Ct. 1532 (1965). *But see Conway Import Co. v. United States,* 311 F. Supp. 5 (E.D.N.Y. 1969) (apart from doctrine of estoppel, there is a duty of consistency and fair dealing on the part of the Commissioner of the Internal Revenue Service); *Simmons v. United States,* 308 F.2d 938 (5th Cir. 1962).

We turn to the facts of this case. The Board of Tax Appeals left open the question whether a deduction can be taken under WAC 458–20–108. It concluded instead that the Department of Revenue changed its policy with respect to the application of WAC 458–20–108 to the widespread industry practice of refunding sales tax to old customers who move and leave oil in their tanks.[4]

The Board found:

1. Appellant is a fuel oil dealer and has followed the practice of refunding the original purchase price and pro-rated sales tax for oil remaining in storage tanks when customers move.

2. The practice followed by appellant is a longstanding practice within the fuel oil industry, has been followed by appellant for 27 years and was approved by the Department of Revenue in its audit of another fuel company in

---

[4]The evidence showed an assumption is the more frequent service.

1971.

3. Appellant and other fuel oil dealers have relied on past interpretations, audit reports and audit instructions issued by the Department of Revenue.

We think two questions are raised: (1) did the Department change its policy with respect to the application of WAC 458-20-108; and (2) did the taxpayer rely on past interpretations, audit reports and instructions? Our review of the record suggests the Board made a mistake in answering these questions in the affirmative.

The evidence showed that in general, oil heat dealers began the refund practice when the sales tax was enacted. The practice went undetected for several years. Then in 1978, in this and other audits, the Department identified the refund practice and assessed deficiencies.[5]

Mr. Tveden, assistant director of the Department of Revenue and Director of the Interpretation and Appeals Division of the Department, had been with the Department since 1953. He testified he had no record of any inquiries about the practice from the Oil Heat Institute or any oil dealers. One inquiry from a propane gas distributor having a similar refund arrangement produced a Department ruling that the refund was improper. Tveden testified that had Martin inquired about the propriety of the practice, it would have been told the practice was improper. This evidence does not show a formal departmental policy or interpretation approving the refund policy.

Martin, as well as the Board, attaches considerable significance to a 1971 field audit report as an indication of the Department's policy of treating "assumptions" and "pumpouts" as returned goods justifying the return of the sales tax to the customer. The audit report dealt with Stan Sorenson Distributors, which sold furnace and stove equipment, automotive oil, batteries, tires, equipment and acces-

---

[5]The Oil Heat Institute immediately notified its members to cease the practice. Although the sales tax refund practice has ceased, it remains a problem for Martin because of the Department's authority to assess a deficiency within 4 years after the close of the tax year. RCW 82.32.050.

sories as well as fuel oil. The audit uncovered a discrepancy between taxes collected and amounts remitted to the State. According to the auditor's testimony, Sorenson's bookkeeper explained that refunds to customers for returned goods did not include the sales tax which was retained by Sorenson. The bookkeeper did not identify the items making up the goods returned and "pumpouts" and "assumptions" were not discussed. The audit report advised Sorenson that the sales tax on returned goods should be returned to the customer as part of the refund and that failure to do so obligates the company to the State in the amount of the retained tax. The auditor testified that in making the report he had in mind tires, accessories and equipment as the items making up the returned goods but conceded the bookkeeper may have been referring to "pumpouts" and "assumptions" since the company did engage in the fuel oil business. However, the auditor's report did not classify "pumpouts" and "assumptions" as returned goods.

The Sorenson report on its face accurately states the law on the treatment of sales taxes on returned goods. At most, a possible ambiguity as to whether "pumpouts" and "assumptions" are returned goods can be inferred when you take into account that Sorenson's sales include fuel oil as well as various items of furnace and automotive equipment. We do not think this evidence demonstrates a policy of approving tax refunds on "pumpouts" and "assumptions." Furthermore, Martin was not even aware of the Sorenson audit report until after the assessment for unpaid taxes which is the subject matter of this appeal.

Nor does the evidence demonstrate informal approval. State auditors testified concerning recent audits of other companies. As they explained, companies are audited by reviewing the tax returns and the books of account, *i.e.,* the general ledger, sales ledger, and/or check register. In general, if a deduction for returned goods is taken, the figures are confirmed by first looking to the books of account, then to the records (*e.g.,* invoices). A sampling from seven recent

audits showed three companies did not evidence pumpouts or assumptions; in two others the company engaged in the practice but an auditor could not tell from looking at the books of accounts; with two other companies, the practice was identifiable from the general ledger.

What can be gleaned from the testimony is that the Department never formally or informally sanctioned the practice. Some companies' books did and some did not reflect this practice. This does not support a finding that there existed a long–standing Department policy before 1978, but rather, instances of sometimes careless auditing, and instances of a practice undetectable from a review of the books. Furthermore, the record does not support a finding Martin relied on past interpretations, audit reports, and instructions.

It is uncontradicted that Martin followed its refund practice for 27 years, that it was audited at least 10 times, and that it was not until the latest audit that the Department criticized the practice. The parties dispute whether the transactions were discernible from Martin's books and records.[6] Martin's controller testified he was not aware of any representations made by the Department to anyone else in the fuel oil industry[7] concerning the refund practice, nor had the Department made any statements to Martin in favor of or against the practice. This evidence presents a pattern of erroneous reporting done in good faith which went undetected because of mistake or inadvertence on the part of state auditors in failing to catch the error after reviewing the books, or because it was not discoverable

---

[6]According to the auditor, Martin's books of accounts did not reflect this practice. Mr. Ellison, controller for Martin, testified the transactions are identifiable from the sales journal. The auditor learned of the practice by asking, having been alerted to the possibility from audits of other companies.

[7]Charles Bishop, president of Oil Heat Institute, suggested this is the type of information normally circulated to its members. He testified the Institute was first alerted to a change in the Department's "policy" in mid–1978. The Institute immediately alerted its members in 1978. This is how Martin first learned its practice may be flawed.

from the books. It does not suggest an act, admission, or statement inconsistent with a claim later asserted, on the faith of which another acts. This is not a situation which is proper for the application of the doctrine of estoppel.

In summary, we have a firm conviction that the Board's findings that the Department changed a previously approved policy relied thereon by Martin were clearly erroneous.

The judgment of the Superior Court is affirmed with instructions to remand the matter to the Board of Tax Appeals to determine whether the taxpayer is legally entitled to a refund of the sales tax at issue.

REED and WORSWICK, JJ., concur.