901 P.2d 1028 (1995)
127 Wash.2d 544
WASHINGTON FEDERATION OF STATE EMPLOYEES; et al., Appellants,
v.
The STATE of Washington and Citizens for Fair Campaign Financing, Respondents.
No. 62082-2.
Supreme Court of Washington, En Banc.
August 31, 1995.
Reconsideration Denied October 24, 1995.
*1030 Marion Leach, Swanson, Parr & Cordes, Robert Spaulding, Edward Younglove, Harriet Strasberg, Olympia, for appellants.
Daniel Ritter, Seattle, Christine Gregoire, Attorney General, Thomas Holcomb, Asst., Roselyn Marcus, Asst., Olympia, for respondent.
*1029 MADSEN, Justice.
At issue is the constitutionality of section 26 of Initiative 134, a campaign reform measure adopted by the voters in 1992. Section 26 repealed former RCW 41.04.230(7), which authorized voluntary state employee pay deductions for registered political committees. On Respondents' motion for summary judgment, the trial court found section 26 constitutional. We conclude that Const. art. 2, § 19, which requires that legislation embrace no more than one subject and that subject be expressed in the title, applies to initiative measures, but that Section 26 is valid under art. 2, § 19. However, as to contracts existing at the time Initiative 134 was adopted, and which are encompassed by the parties' stipulated facts, Section 26 constitutes an unconstitutional impairment of contracts in violation of Const. art. 1, § 23. We reverse.
Respondent Citizens for Fair Campaign Financing (Citizens) is a public interest citizens group which sponsored and helped draft Initiative 134. After sufficient signatures were collected the initiative was submitted to the Secretary of State, who submitted it to the Attorney General for ballot title drafting *1031 pursuant to RCW 29.79.040. The measure was then included in the 1992 general election.
The ballot title stated the purpose of the measure as: "Shall campaign contributions be limited; public funding of state and local campaigns be prohibited; and campaign related activities be restricted?" Clerk's Papers, at 81, 85. The measure contained a number of provisions relating to contributions to campaigns for state offices. Section 26 of the initiative repealed RCW 41.04.230(7), which authorized state employees to have voluntary payroll deductions contributed to registered political committees. RCW 41.04.230(7) was enacted after this court's decision that absent statutory authority, such deductions were unlawful. Washington Educ. Ass'n v. Smith, 96 Wash.2d 601, 606, 638 P.2d 77 (1981). Initiative 134 was adopted in the November 3, 1992, general election by a 72 percent margin.
On November 30, 1992, the Washington Federation of State Employees (WFSE), the Washington Education Association (WEA), and individual civil service and academic employees filed suit against the State of Washington seeking a declaratory judgment that section 26 of the initiative is unconstitutional and unlawful, injunctive relief, and costs and attorney fees. By agreed order, Citizens was permitted to intervene as an intervenor/defendant.[1]
WFSE is the exclusive bargaining representative for approximately 68 bargaining units composed of over 23,000 employees, some 20,000 members of which are civil service employees of the State of Washington. Approximately 2,300 of these members contributed through payroll deduction to WFSE's national affiliate's political committee (PEOPLE). Total contributions amounted to approximately $100,000 per year, with individual contributions averaging $1.90 per pay period (twice a month).
WEA has members who are academic employees of the State's community colleges. Approximately 700 academic employees contributed to WEA's political action committee (PULSE). Some of these employees also contributed by payroll deduction to NEA-PAC, WEA's national affiliate's political action committee.
Based on an order entered December 7, 1992, the State agreed to continue making payroll deductions for state employees who were members of WFSE and WEA. This order was continued until March 22, 1993, and again continued pending further proceedings.
Both sides moved for summary judgment based upon stipulated facts and appendices. The parties stipulated that "[s]ubsequent to the adoption of [former] RCW 41.04.230(7), some labor organizations have entered into collective bargaining agreements with employers, authorizing that employer specifically to make payroll deductions to political action committees". Clerk's Papers, at 29. An "example" of such an agreement was submitted to the trial court.
According to affidavits of individual employees/members of WFSE and WEA, individual contributors to PEOPLE, NEA-PAC, and PULSE would cease to or likely "would not" contribute to political committees if the payroll deduction process were eliminated. Clerk's Papers, at 35, 44, 48, 52. According to affidavits, the payroll deduction procedure is convenient, unlike direct yearly, half-yearly, or quarterly lump-sum contributions which are too difficult, impractical, and expensive.
On July 7, 1993, the trial court granted summary judgment in favor of Respondents the State and Citizens, and dismissed Plaintiffs' complaint, ruling that Const. art. 2, § 19, the single subject/title provision of the state constitution, does not apply to initiatives, that section 26 of Initiative 134 does not impair existing contracts, that Appellants WEA, WFSE, and the individual state employees failed to file for relief under RCW 29.79.040 within the required time period and therefore could not challenge the ballot title under that statute, and that Initiative 134 is valid. Also on July 7, 1993, the court entered an order staying enforcement of the decision.
*1032 WFSE, WEA, and the individual employees appealed. On September 13, 1993, the Court of Appeals entered an agreed restraining order obligating the State to continue the deductions, pending conclusion of this appeal, and to deposit them in a blocked account with a monthly accounting to Respondents and no withdrawals except by agreement or court order. WEA elected not to continue the deductions pending appeal.
This court accepted certification of the appeal from the Court of Appeals.

ANALYSIS
This matter is here on appeal from summary judgment, which is properly granted if there are no material issues of fact and the moving party is entitled to judgment as a matter of law. An appellate court reviews a grant of summary judgment de novo. Havens v. C & D Plastics, Inc., 124 Wash.2d 158, 176-77, 876 P.2d 435 (1994).

Article 2, Section 19
Const. art. 2, § 19 provides that "[n]o bill shall embrace more than one subject, and that shall be expressed in the title". Appellants argue that Section 26's purpose is not embraced within the ballot title of Initiative 134, and accordingly Section 26 is unconstitutional and should be stricken.
Initially, the parties dispute whether Const. art. 2, § 19 applies to initiative measures. In 1951, the court held that Const. art. 2, § 19 does not apply to initiatives. Senior Citizens League, Inc. v. Department of Social Sec., 38 Wash.2d 142, 172, 228 P.2d 478 (1951). A majority of the court, however, later rejected that holding in Fritz v. Gorton, 83 Wash.2d 275, 517 P.2d 911, appeal dismissed, 417 U.S. 902, 94 S.Ct. 2596, 41 L.Ed.2d 208 (1974), wherein six Justices concluded that the analysis in Senior Citizens was incorrect and that its holding should be overturned. Fritz, at 328-42, 517 P.2d 911 (Rosellini, J., dissenting, joined by Hunter, J.); Fritz, at 315-16, 517 P.2d 911 (Utter, J., concurring, joined by Justices Stafford and Brachtenbach); Fritz, at 316, 517 P.2d 911 (Hamilton, J., concurring in Justice Utter's concurrence).
Justice Rosellini reasoned that amendment 7, which established the initiative right, was an amendment to Const. art. 2, which concerns legislative authority, and therefore the provisions of article 2, including section 19, are applicable to both the legislative and initiative processes. Simply stated, "[a] bill is a draft of a law to be enacted by the legislature or by the electors via the initiative process". Fritz, at 330, 517 P.2d 911 (Rosellini, J., dissenting). He also pointed out that a majority of courts in other jurisdictions had held provisions similar to Const. art. 2, § 19 applicable to initiatives. Fritz, at 330-32, 517 P.2d 911 (Rosellini, J., dissenting).
Examining the bases for Const. art. 2, § 19, the dissent concluded the policies underlying the provision also apply to initiatives: to provide notice of the contents of the legislation, and to prevent hodgepodge or logrolling legislation. Fritz, at 332-33, 517 P.2d 911. The dissent particularly emphasized the danger of logrolling, generally described as the "the practice of drafting and submitting a bill to the legislature in such a form that a legislator is required to vote for something of which he disapproves in order to obtain approval of another unrelated law". Fritz, at 333, 517 P.2d 911 (Rosellini, J., dissenting) (quoting State v. Waggoner, 80 Wash.2d 7, 9, 490 P.2d 1308 (1971)).
The requirement that all legislative proposals include no more than one subject is consistent with basic democratic principles. The requirement is designed to present clear legislative proposals to the legislature or the public and forestall the combining of issues so that ones with minimal public support are not adopted merely because they are attached to popular proposals.
Fritz, at 335, 517 P.2d 911 (Rosellini, J., dissenting). Further, the requirement forestalls combining two proposals, neither of which has majority support, as a tactic by legislators or initiative petitioners to obtain passage of both. Fritz, at 336, 517 P.2d 911 (Rosellini, J., dissenting). See also State ex rel. Jones v. Charboneau's, 27 Wash.App. 5, 615 P.2d 1321 (holding that Const. art. 2, § 19 does apply to initiatives), review denied, 94 Wash.2d 1021 (1980).
*1033 Because six members of the court in Fritz agreed that the constitutional provision applies to initiatives and that Senior Citizens should be overruled, Senior Citizens was, in fact, overruled on this issue by Fritz. See, e.g., State v. Brown, 113 Wash.2d 520, 533, 782 P.2d 1013, 787 P.2d 906, 80 A.L.R.4th 989 (1989) (citing as majority opinion on an issue State v. Pam, 98 Wash.2d 748, 763, 659 P.2d 454 (1983) (Utter, J., concurring), overruled in part by State v. Brown, supra).
Respondents also argue that notice of an initiative's contents is expressly mandated by the constitution in Const. art. 2, § 1(e) (amend. 72), and Const. art. 2, § 19 accordingly does not apply to initiatives. They maintain that voters are fully informed of a measure's contents through the voters pamphlet with its explanatory statement.
Const. art. 2, § 1(e), when first adopted in 1912 as part of amendment 7, provided that
[t]he legislature shall provide methods of publicity of all laws or parts of laws, and amendments to the constitution referred to the people with arguments for and against the laws and amendments so referred, so that each voter of the state shall receive the publication at least fifty days before the election at which they are to be voted upon.
By amendment 36, approved in 1962, the last clause was deleted, and language added:
The secretary of state shall send one copy of the publication to each individual place of residence in the state and shall make such additional distribution as he shall determine necessary to reasonably assure that each voter will have an opportunity to study the measures prior to election.
RCW 29.81 implements the requirements of Const. art. 2, § 1(e) (amend. 72), setting forth requirements for voters pamphlets, including the ballot title, a brief statement explaining the law as it exists and the effect of the proposed measure, and arguments pro and con.
While Respondents' argument has some appeal, for two reasons it is not compelling. First, as the court noted in another context in In re Ballot Title for Initiative 333, 88 Wash.2d 192, 198, 558 P.2d 248, 559 P.2d 562 (1977):
We can safely assume that not all voters will read the text of the initiative or the explanatory statement. Some voters may cast their votes based on the ballot title as it appears on their ballots. Thus, the outcome of the vote may be affected by the tenor of the ballot title.
Thus, in a broad sense, notice of the contents of an initiative provided by the voters pamphlet may not serve the notice purpose of the title rule in Const. art. 2, § 19.
Second, the information mandated by Const. art. 2, § 1(e) (amend. 72) does not serve the second policy underlying Const. art. 2, § 19, i.e., the avoidance of logrolling. In this regard, Respondent State mischaracterizes the nature of the evil sought to be prevented, claiming that logrolling pertains to bill amendments which are otherwise not related to the bill or its title. It then points out that initiatives do not have amendments. Logrolling or hodge-podge legislation, however, is not confined to situations where an amendment adds the unrelated subject. Just as legislation can include such unrelated subjects from the outset, so too can an initiative. Thus, applying Const. art. 2, § 19 to initiatives serves an important policy which Const. art. 2, § 1(e) (amend. 72) cannot serve.
Respondent Citizens next argues that the 20-word limitation of ballot titles in effect in 1992 is another basis on which to find that Const. art. 2, § 19 does not apply to initiatives, pointing out that when Fritz was decided, the authorized length was 100 words. We reject this argument, too, for as discussed below, the ballot title in this case passes constitutional muster, even with the 20-word limit.
Moreover, this court has long recognized that a general title consisting of a few wellchosen words, suggesting the general subject stated, is all that is necessary to comply with the constitutional provision. E.g., State ex rel. Scofield v. Easterday, 182 Wash. 209, 212, 46 P.2d 1052 (1935); State ex rel. Seattle Else. Co. v. Superior Court, 28 Wash. 317, 322, 68 P. 957 (1902).
*1034 Next, the parties dispute whether Const. art. 2, § 19 applies to an initiative's ballot title, or to its legislative title.
Not all initiatives have legislative titles, as the court recognized in Senior Citizens, at 173, 228 P.2d 478. Moreover, it is the ballot title with which voters are faced in the voting booth. For these reasons, we conclude it is the ballot title to which the constitutional provision is applied where an initiative to the people is concerned. The court also reasoned in State ex rel. Jones v. Charboneau's, 27 Wash.App. 5, 8-9, 615 P.2d 1321, review denied, 94 Wash.2d 1021 (1980) that it is the ballot title which can be appealed prior to an election, RCW 29.79.060, and the ballot title which thereafter appears on petitions and on the ballot.
The ballot title of Initiative 134 states: "Shall campaign contributions be limited; public funding of state and local campaigns be prohibited; and campaign related activities be restricted?" Clerk's Papers, at 81, 85.
Const. art. 2, § 19 is to be liberally construed in favor of the legislation. State Fin. Comm. v. O'Brien, 105 Wash.2d 78, 80, 711 P.2d 993 (1986); Washington State Sch. Directors Ass'n v. Department of Labor & Indus., 82 Wash.2d 367, 371, 510 P.2d 818 (1973). "The title to a bill need not be an index to its contents; nor is the title expected to give the details contained in the bill." Treffry v. Taylor, 67 Wash.2d 487, 491, 408 P.2d 269 (1965) (citing cases), appeal dismissed, 385 U.S. 10, 87 S.Ct. 70, 17 L.Ed.2d 10 (1966). "[A] title complies with the constitution if it gives notice that would lead to an inquiry into the body of the act, or indicate to an inquiring mind the scope and purpose of the law." YMCA v. State, 62 Wash.2d 504, 506, 383 P.2d 497 (1963); Treffry, at 491, 408 P.2d 269.
Titles may be restrictive or general, i.e., narrow or broad. Gruen v. State Tax Comm'n, 35 Wash.2d 1, 22, 211 P.2d 651 (1949), overruled on other grounds by State ex rel. State Fin. Comm. v. Martin, 62 Wash.2d 645, 384 P.2d 833 (1963), quoted in State Finance Committee, 105 Wash.2d at 80, 711 P.2d 993. Where the title is general, "any subject reasonably germane to such title may be embraced within the body of the bill". De Cano v. State, 7 Wash.2d 613, 627, 110 P.2d 627 (1941); Washington Toll Bridge Auth. v. State, 49 Wash.2d 520, 523, 304 P.2d 676 (1956). The constitution is not violated even if the general subject contains several incidental subjects or subdivisions. State v. Grisby, 97 Wash.2d 493, 498, 647 P.2d 6 (1982), cert. denied, 459 U.S. 1211, 103 S.Ct. 1205, 75 L.Ed.2d 446 (1983). "All that is required is that there be some `rational unity' between the general subject and the incidental subdivisions." Grisby, at 498, 647 P.2d 6 (quoting Kueckelhan v. Federal Old Line Ins. Co., 69 Wash.2d 392, 403, 418 P.2d 443 (1966); see Scott v. Cascade Structures, 100 Wash.2d 537, 545, 673 P.2d 179 (1983). The court "has never favored a narrow construction of the term `subject' as used in Const. art. 2, § 19". State v. Waggoner, 80 Wash.2d 7, 9, 490 P.2d 1308 (1971).
"When the words in a title can be given two interpretations, one of which renders the act unconstitutional and the other constitutional, we adopt the constitutional interpretation....". Treffry, at 491, 408 P.2d 269. Also, any reasonable doubts are resolved in favor of constitutionality. This doctrine applies with particular force when the issue relates to constitutional form, because legislative procedure is involved, i.e., "the methods of transacting public business by a co-ordained branch of the state government", and not "those constitutional guaranties of personal rights which it is the peculiar province of the courts to protect". Holzman v. Spokane, 91 Wash. 418, 421, 157 P. 1086 (1916). In approving initiative measures, the people exercise the same power of sovereignty as the Legislature when it enacts a statute. In re Estate of Thompson, 103 Wash.2d 292, 294, 692 P.2d 807 (1984).
Under Const. art. 2, § 19, the title is construed with reference to the language used in the title. Great N. Ry. v. Cohn, 3 Wash.2d 672, 680, 101 P.2d 985 (1940). Moreover, a court examines the body of the act to determine whether the title reflects the subject matter of the act. State ex rel. *1035 Washington Toll Bridge Auth. v. Yelle, 32 Wash.2d 13, 23, 200 P.2d 467 (1948).
Finally, there is no particular obstacle raised by the fact that repeal of a statute may be a subject of the legislation without indication in the title that repealer is involved. See, e.g., Maxwell v. Lancaster, 81 Wash. 602, 607, 143 P. 157 (1914) ("[t]he legislature may, under a title relating to a general subject, repeal existing laws as well as create new ones").
As Respondents argue, Initiative 134's ballot title is a general, not a restrictive, title, broadly encompassing limitations on campaign contributions, prohibitions on public funding for campaigns, and restrictions on campaign related activities, without further defining or identifying what limitations, prohibitions, or restrictions are proposed or how they are to be carried out. Measured by the applicable legal principles, section 26 is constitutionally encompassed by this general subject title. Repeal of former RCW 41.04.230(7) eliminates one method of making contributions to political committees. Under RCW 42.17.020(25), a political committee "means any person (except a candidate or an individual dealing with his own funds or property) having the expectation of receiving contributions or making expenditures in support of, or opposition to, any candidate or any ballot proposition". Deductions going to political committees may lawfully be used for expenditures relating to political campaigns. Thus, a rational nexus between section 26 and the ballot title exists; section 26 is germane to the ballot title.
Section 26 is not invalid under Const. art. 2, § 19.

RCW 29.79.040
Appellants also challenged the ballot title on the ground it does not satisfy RCW 29.79.040. Former RCW 29.79.040 provided in part that "[w]ithin seven calendar days after the receipt of an initiative or referendum measure the attorney general shall formulate and transmit to the secretary of state a concise statement posed as a question and not to exceed twenty words ...".[2] The statement "may be distinct from the legislative title of the measure, and shall give a true and impartial statement of the purpose of the measure". Laws of 1982, ch. 116, § 4. The trial court held Appellants' claim untimely under RCW 29.79.060, which requires that a challenge based upon RCW 29.79.040 be made within five days from the filing of the ballot title.
Appellants argue that inadequacy of notice provisions in RCW 29.79.060, coupled with an unreasonably short statutory period in which to challenge a ballot title, deprived them of a meaningful opportunity to challenge the ballot title under the statute, thus violating their due process rights.
A statute is presumed constitutional, and a heavy burden is placed on one seeking to overcome the presumption; the statute's unconstitutionality must be proved beyond a reasonable doubt. State Finance Committee, 105 Wash.2d at 80, 711 P.2d 993; State v. Hernandez-Mercado, 124 Wash.2d 368, 380, 879 P.2d 283 (1994). Due process protections are implicated only where the individual interest asserted is encompassed within the protection of life, liberty, or property. Ritter v. Board of Comm'rs, 96 Wash.2d 503, 637 P.2d 940 (1981). Appellants have failed to meet their heavy burden because they have failed to persuasively identify a protected interest.
Appellants mention a liberty interest in liberty of the mind, citing State v. Maryott, 6 Wash.App. 96, 492 P.2d 239 (1971), where the court discussed liberty of the mind and freedom of thought, free from any unconsented control by the State, in the context of administering psychochemicals to a criminal defendant and the effect on the defendant's ability to assist in a defense. There is no claim here of any attempt by the government to control or affect the mind or thought.
Appellants also argue a liberty interest includes the right to participate in the ballot title process, citing State ex rel. Case v. Superior Court, 81 Wash. 623, 643, 143 P. 461 (1914). There, challengers of an initiative *1036 appealed from the Secretary of State's determination that sufficient valid signatures had been obtained. After passage of a statutory 5-day period for challenging the Secretary's decision, a representative of the measure's proponents was permitted to intervene and claim that the Secretary had erroneously rejected several hundred names. The opponents claimed the challenge was untimely. The court disagreed, holding that the objection of the proponents was put forward merely by way of defense, and applying the general principle that a statute of limitations never runs on a defense arising out of the same transaction sued upon. State ex rel. Case, at 643-44, 143 P. 461; see, e.g., Allis-Chalmers Corp. v. North Bonneville, 113 Wash.2d 108, 112, 775 P.2d 953 (1989); Ennis v. Ring, 56 Wash.2d 465, 471, 353 P.2d 950 (1959). Thus, State ex rel. Case does not support Appellants' argument.
Next, Appellants rely upon In re Ballot Title for Initiative 333, supra, and Schrempp v. Munro, 116 Wash.2d 929, 936, 809 P.2d 1381 (1991) for the proposition that opponents of a ballot measure have a liberty interest in an impartial, fair ballot title. This argument, too, fails. When In re Ballot Title for Initiative 333, supra, was heard, RCW 29.79.060 permitted only the measure's proponents to challenge the Attorney General's ballot title. The court concluded there were no reasonable grounds to distinguish between opponents and proponents of an initiative in this area, where the aim of RCW 29.79.040 is an impartial statement of the purpose of a measure, one which shall not "intentionally [be] an argument, nor likely to create prejudice, either for or against the measure". (Italics omitted.) 88 Wash.2d at 196, 558 P.2d 248. The court observed that denying review only to opponents has the effect of sustaining a ballot title favorable to proponents, while allowing proposers to challenge a title unfavorable to their purpose. In re Ballot Title for Initiative 333, supra, at 196, 558 P.2d 248. The court concluded that "equal protection and due process of law require that [opponents] be afforded the same right to challenge the ballot title as that afforded proponents ...". In re Ballot Title for Initiative 333, supra, at 198, 558 P.2d 248. Although the court mentioned due process in passing, the challenge actually addressed was an equal protection challenge. Significantly, the equal protection right recognized in In re Ballot Title is tied to the impartiality of a ballot title as required by RCW 29.79.040.
We do not decide the question whether Appellants in fact have a liberty interest protectable under due process guaranties. We simply hold that Appellants have failed to clearly establish such an interest, and therefore have failed to overcome the presumption that RCW 29.79.060 is constitutional. Because Appellants' constitutional challenge to RCW 29.79.060 fails, their failure to timely challenge the ballot title under that statute precludes their claim of noncompliance with RCW 29.79.040.

Article 1, Section 23
Although Section 26 is not unconstitutional and void under art. 2, § 19 as we explained above, Section 26 constitutes an unconstitutional impairment of those existing contracts coming within the parties' stipulated facts.
Appellants maintain that section 26's repeal of former RCW 41.04.230(7) violates Const. art. 1, § 23, which provides: "No bill of attainder, ex post facto law, or law impairing the obligations of contracts shall ever be passed." This prohibition applies to "any form of legislative action, including ... direct action by the people". Ruano v. Spellman, 81 Wash.2d 820, 825, 505 P.2d 447 (1973). Article 1, section 10 of the United States Constitution states that "[n]o state shall ... pass any ... law impairing the obligation of contracts ...". The parties do not argue any different analysis applies under the state constitution.
The prohibition against any impairment of contracts "is not an absolute one and is not to be read with literal exactness". Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 428, 78 L.Ed. 413, 54 S.Ct. 231 [236] 88 A.L.R. 1481 (1934). But when a state interferes with its own contracts, those impairments "face more stringent examination under the Contract Clause than would laws regulating contractual relationships between private parties". Allied *1037 Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 n. 15, 57 L.Ed.2d 727, 98 S.Ct. 2716 [2722 n. 15] (1978). Accord Caritas Servs., Inc. v. Department of Social & Health Servs., 123 Wn.2d 391, 402-03, 869 P.2d 28 (1994)....
This court uses a 3-part test to determine if there has been an impairment of public contract: (1) does a contractual relationship exist, (2) does the legislation substantially impair the contractual relationship, and (3) if there is a substantial impairment, is it reasonable and necessary to serve a legitimate public purpose. Caritas, at 403 [869 P.2d 28]; Carlstrom v. State, 103 Wn.2d 391, 694 P.2d 1 (1985).
Tyrpak v. Daniels, 124 Wash.2d 146, 151-52, 874 P.2d 1374 (1994).
Appellants make two arguments in support of a claimed contract right: a contract right based upon collective bargaining agreement provisions, and a right created by former RCW 41.04.230(7). Turning to the latter contention first, Appellants maintain that section 26 violated contract rights because former RCW 41.04.230(7) itself must be treated as a contract.
"Generally, a statute is treated as a contract when the language and circumstances demonstrate a legislative intent to create rights of a contractual nature enforceable against the State." Washington Fed'n of State Employees, Coun. 28, v. State, 101 Wash.2d 536, 539, 682 P.2d 869 (1984) (citing United States Trust Co. v. New Jersey, 431 U.S. 1, 17 n. 14, 97 S.Ct. 1505, 1515 n. 14, 52 L.Ed.2d 92 (1977)).
Appellants argue that former RCW 41.04.230(7) was clearly intended to remedy this court's ruling in Washington Educ. Ass'n v. Smith, 96 Wash.2d 601, 638 P.2d 77 (1981). Appellants conclude without further argument that this establishes legislative intent to create a statutory contract right.
Statutorily created contract rights, however, are rare. This court has recognized that state employees' pension rights are of a contractual nature, though established by statutes. Bakenhus v. Seattle, 48 Wash.2d 695, 296 P.2d 536 (1956). Appellants cite no cases other than pension cases where state employee contract rights have been established by statute. We agree with Respondents that the right granted by former RCW 41.04.230(7) is more akin to civil service laws governing the terms and conditions of employment, and hold that no statutory contract right was created by former RCW 41.04.230(7). See Washington Federation of State Employees.
Appellants also argue that section 26 impairs negotiated contracts (collective bargaining agreements). In the stipulated facts, the parties agreed that "some labor organizations have entered into collective bargaining agreements with employers, authorizing that employer specifically to make payroll deductions to political action committees". Clerk's Papers, at 29. One "example" of such an agreement is attached to the stipulated facts. It states:
Consistent with applicable laws, the HCEA shall have the right to payroll deduction of membership dues and representation fees, including contribution to political action committees, for faculty, and such dues and representation fee shall be remitted by the College.
Clerk's Papers, at 76 (1989-91 agreement between Highline Community College and Highline College Education Association, an affiliate of WEA). According to the affidavit of Katherine Gribble, a history instructor at Highline Community College and president of the Association for Higher Education, a department of the Washington Education Association, this language was negotiated after former RCW 41.04.230(7) was passed by the Legislature.
In dispute is the import of the language "[c]onsistent with applicable law". Clerk's Papers, at 76. Respondents maintain that the contract language expressly makes payroll deductions subject to applicable laws, i.e., payroll deductions would be allowed only so long as the deductions were authorized by statute. Repeal of the statute, terminates the deductions because the language "[c]onsistent with applicable law" was intended as a reservation of powers clause including power to retroactively change the right to voluntary payroll deductions. Clerk's Papers, at 76.
*1038 To be effective as a reservation of powers clause, the language must specifically and explicitly mention future retroactive modification of preexisting or already performed contracts. Caritas Servs. v. Department of Social & Health Servs., 123 Wash.2d 391, 406-07, 869 P.2d 28 (1994). Explicit language is needed to constitute a reservation of powers clause. In Carlstrom v. State, 103 Wash.2d 391, 393, 694 P.2d 1 (1985), we held that a general clause saying the agreement was "subject to all present and future acts of the legislature" was not explicit as to future appropriations legislation affecting a salary increase provision. The language in the example contract in this case is not explicit enough to suffice as a reservation of powers clause.
Moreover, the provision begins "Consistent with applicable law ...". Clerk's Papers, at 76. The only law that the provision was consistent with was former RCW 41.04.230(7); the contract provision would clearly not be consistent with law which prohibited the payroll deduction. Clearly, the contract contemplates only law which permits the deduction.
"A contract is impaired by a statute which alters its terms, imposes new conditions or lessens its value." Caritas, at 404, 869 P.2d 28 (citing Federated Am. Ins. Co. v. Marquardt, 108 Wash.2d 651, 660, 741 P.2d 18 (1987)). "Impairment may be substantial if the complaining party relied on the supplanted portions of the contract." Caritas, at 405, 869 P.2d 28.
Section 26's repeal of former RCW 41.04.230(7) nullifies a deduction provision like that in the HCEA contract example because absent statutory authorization, state employees' voluntary payroll deductions for political committees are unlawful. Thus, the contract term is altered by repeal, and the contract is impaired.
The State argues that any impairment is not substantial because payroll deductions are not an essential element of employment or of collective bargaining agreements. We disagree. As Appellants persuasively argue, for employees whose employer is the State, whose salary increases, benefits, and other incidents of employment are governed by statute, the ability to make payroll deductions to political action committees is vital. Appellants have submitted affidavits of individual employees who place great value on their ability to easily and regularly contribute to such committees to further a favorable political agenda. The individuals say they would not make the same contributions otherwise.
Also persuasive is the history of the law in this area, i.e., this court's invalidation of state employees' voluntary payroll deductions for political committees absent statutory authorization, followed by the expressly negotiated contract terms mandating employers to make such deductions once former RCW 41.04.230(7) was enacted. The record clearly demonstrates that employee funding of political committees is important to the political needs of state employees and that the convenience of the payroll deduction program is a major factor in contributions to political committees.
"Even if a substantial impairment of contract occurs, ... it may nonetheless be constitutional if it was reasonable and necessary to achieve a legitimate public purpose." Caritas, at 411, 869 P.2d 28 (citing United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)). "In determining whether retroactive legislation is `necessary', courts consider whether the legislative purpose could have been achieved by alternative means which would not have impaired the contract." Caritas, at 411, 869 P.2d 28 (citing Carlstrom v. State, 103 Wash.2d 391, 694 P.2d 1 (1985)).
The State argues that the impairment is necessary to serve the compelling governmental interest in preventing the corrupting influence of money in the political process or the appearance of such corruption caused by a campaign financing system. Repealing former RCW 41.04.230(7), however, does not prevent political campaign contributions, nor does it limit amounts which may be contributed (though other provisions of Initiative 134 limit such contributions).
Respondent Citizens says the police power justifies the repeal of former RCW 41.04.230(7), citing Washington Educ. Ass'n, *1039 96 Wash.2d at 606, 638 P.2d 77. There the court reasoned that in certain statutes the Legislature had disapproved the use of state property for soliciting or making political contributions.
Appellants correctly maintain it is the employees' money which is contributed, and not public funds. Moreover, Washington Educ. Ass'n did not say that such deductions were never lawful, but that legislative approval was needed for such deductions.
Although the court in Washington Educ. Ass'n concluded there must be cost to the State for processing payroll deductions, we do not accept the argument that eliminating such costs is a police power objective justifying impairment of contract rights to payroll deductions. First, as Appellants argue, a negotiated collective bargaining agreement necessarily involves some give and take, and we do not assume that the costs are purely out-of-pocket costs for which the State received nothing in exchange. In addition, there are other authorized payroll deductions which, presumably, share a similar "cost", such as for employees' insurance premiums, charitable contributions, United States savings bond purchases, and payments to banks, savings banks and savings and loan associations. RCW 41.04.230. Because section 26 does not prevent infusion of money into the political process, and state resources are involved in processing other payroll deductions, we conclude that elimination of state employees' contract rights to voluntary payroll deductions for political committees is not a legitimate public purpose justifying impairment of contract rights.
Although we hold that section 26 unconstitutionally impairs contracts in existence at the time of its adoption, this holding does not affect contracts negotiated after Initiative 134 was adopted.
Reversed on the basis that section 26 is unconstitutional as an impairment of those contracts existing upon its enactment which fall within the parties' stipulated facts. This matter is remanded for further proceedings consistent with this opinion.
DURHAM, C.J., and DOLLIVER, SMITH, GUY and ALEXANDER, JJ., concur.
TALMADGE, Justice (concurring in part/dissenting in part).
I concur in the majority's view that art. 2, § 19 of the Washington Constitution applies to initiative measures such as Initiative 134. I write separately to emphasize my concern that this court's treatment of art. 2, § 19 cases has too often been a talismanic recitation of the "rational unity" doctrine without a real discussion of what that doctrine means. This lack of a real standard is frustrating for legislators and the public alike.
I disagree with the majority's decision on the scope of remand, believing that the court should reverse the trial court's decision that art. 2, § 19 does not apply to popular enactments. We should remand the case to the trial court to determine if § 26 of Initiative 134 complied with art. 2, § 19 of the Washington Constitution.
1. Article 2, § 19 Applies to Initiative Measures
The majority is correct in determining that art. 2, § 19 of the Washington Constitution applies to initiatives and referenda for the reasons articulated in the majority opinion.
Washington case law has explicitly indicated that the purpose of art. 2, § 19 is to call attention through the title of the legislation to its general subject matter, and to prevent logrolling, that is, the combination of measures that could not be passed separately or the attachment of an unpopular section to a more popular piece of legislation. Majority opinion, at 1032.
As the majority correctly discerns, these purposes must be met both for enactments by the Legislature and enactments by the people. Enactments by the people may, as with legislative enactments, be the product of logrolling or contain provisions that are not revealed to the average reader from the title of the act or the ballot question for the measure.[1] Initiatives and referenda are a *1040 valuable tool in direct democracy for the people of the State of Washington. The potential for abuse of initiatives and referenda is, in many respects, more significant than the possibility of abuse of the legislative process. There is no public hearing process for initiatives and referenda, as for bills in the Legislature. Once submitted to the voters, initiatives and referenda cannot be amended. Once adopted, initiatives and referenda may be amended only by a super-majority for two years after enactment. Art. 2, § 1(c). As Justice Rosellini forcefully noted in Fritz v. Gorton, 83 Wash.2d 275, 333, 517 P.2d 911 (1974):[2]
Logrolling is an even greater danger to the democratic exercise of power in the initiative process. What is to prevent an individual or a group from including mildly objectionable legislationthat is, legislation which might benefit a small group and is mildly disfavored by the electorate as a wholein an initiative measure which includes other legislation which has great popular appeal? In the legislature the committee process assures that such a provision will be detected; the amendment process provides the remedy. The legislature can delete parts of a proposal it disfavors; the electorate is faced with a Hobson's choice: reject what it likes or adopt what it dislikes. Only article 2, section 19, preserves the integrity of the initiative process.
2. Analytical Framework for Art. 2, § 19 Cases
Although the majority is correct in applying art. 2, § 19 to popularly enacted measures, it relies upon the traditional recitation of the "rational unity" doctrine to find that § 26 of Initiative 134 does not violate art. 2, § 19. The majority correctly notes that our decisions generally afford the Legislature wide latitude in discerning whether or not the title of an act adequately describes the content of the legislation. The courts also liberally construe art. 2, § 19 to uphold the Legislature's determination that the subdivisions in an enactment are all part of one subject. Majority opinion, at 1034-1035. In general, so long as there is a rational unity between the general subject of the legislation, as expressed in the title, and the various segments of the legislation, the constitutional provision is satisfied. Majority opinion, at 1034-1035.
This court, however, has not discussed whether a challenge to legislation based on art. 2, § 19 is a question of law or a question of fact, or a mixture. Moreover, while we have often stated that a rational unity test is to be employed, this formula has never been analyzed with any precision. It gives very little guidance to legislators or proponents of initiatives and referenda in the drafting of legislation. A careful discussion of the analytical *1041 framework for cases arising under art. 2, § 19 is needed.
(a) Mixed Questions of Law and Fact
Challenges to legislation based on art. 2, § 19 involve both factual and legal elements, as counsel for the Public Disclosure Commission (PDC) conceded in oral argument. Mixed questions of law and fact are reviewed under a hybrid standard. Substantial evidence must support the factual finding while the legal issue is reviewed de novo. Washam v. Pierce Cy. Democratic Cent. Comm., 69 Wash.App. 453, 459, 849 P.2d 1229 (1993), review denied, 123 Wash.2d 1006, 868 P.2d 872 (1994). The trial court here is better equipped than this court to undertake the fact-finding function, and the parties should be allowed on remand to make a record.
(b) Constitutional Framework for Art. 2, § 19
The constitutional framework for art. 2, § 19 makes it clear that the single-subject provision is intended to ensure fairness in the process of proposing, considering and enacting legislation. The framers of the Washington Constitution (Framers) afforded substantial discretion to the Legislature as to how it was to conduct its business, making each house of the Legislature the judge of the election returns and qualifications of its own members, art. 2, § 8, and responsible for its own procedures. Art. 2, § 9. The Framers, however, feared secret proceedings and legislation, and expressed the need in the Constitution for the public to be informed about the enactment of laws. Implicit in this concern is the suspicion that the process for enactment of legislation could be misused and the public good undermined by forces working in a secretive fashion. In art. 2, § 11, the Framers provided for the maintenance of legislative journals and expressed a preference for open meetings. In art. 2, § 21, they gave one-sixth of the members the right to demand recorded votes. Recorded votes are mandatory if final passage of legislation is at stake. Art. 2, § 22. Elections of legislative officers are by recorded vote. Art. 2, § 27. Last minute introduction of bills in a legislative session is generally proscribed. Art. 2, § 36.
Consistent with the principles of open process and notice to legislators and citizens are two other constitutional provisions that must be read in conjunction with art. 2, § 19. In art. 2, § 37, the Framers provided that
No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length.
This section of the Constitution is designed to fulfill two purposesto give notice to those affected by an existing law of any change, Washington Educ. Ass'n v. State, 93 Wash.2d 37, 604 P.2d 950 (1980), and to protect the Legislature and the public from deceptive practices. Spokane Grain & Fuel Co. v. Lyttaker, 59 Wash. 76, 109 P. 316 (1910). In art. 2, § 38, the Framers prohibited non-germane amendments in the legislative process:[3]
*1042 No amendment to any bill shall be allowed which shall change the scope and object of the bill.
Given the context of the Framers' work in Article 2 of the Washington Constitution, it is clear that art. 2, § 19 was designed to advance policies of notice to the Legislature and the public with respect to bills and to prevent deceptive legislative practices. Flanders v. Morris, 88 Wash.2d 183, 558 P.2d 769 (1977). Art. 2, § 19 states:
No bill shall embrace more than one subject, and that subject shall be expressed in the title.
Art. 2, § 19 contains two distinct tests. First, are the sections of the legislation connected by a rational relationship, or, as the case law has expressed it, are the provisions of the legislative enactment connected by a rational unity? Second, is the subject of the legislation accurately expressed in the title of the act? See, e.g., Fritz, at 289-91, 517 P.2d 911. Each of these questions is a distinct question under art. 2, § 19 and must be satisfied in order for a legislative or popular enactment to conform to constitutional standards in Washington.
(c) Rational Unity Test
Where an enactment contains multiple subdivisions, those subdivisions must be connected by a rational unity to satisfy art. 2, § 19. While the concept of "rational unity" is easy to articulate, it is difficult to describe in actual operation. Washington appellate courts have, at the time of this opinion, considered numerous cases involving art. 2, § 19, but no case has yet put flesh on the bones of the rational unity test.[4]
One of the earliest formulations of the rational unity rule is found in Kueckelhan v. Federal Old Line Ins. Co., 69 Wash.2d 392, 418 P.2d 443 (1966). The court upheld a statute creating Washington's insurance code, providing for the offices of Insurance Commissioner and State Fire Marshall, and establishing penalties for violation of insurance regulations. The court stated:
All that is required is that there be some "rational unity" between the general subject and the incidental subdivisions. If this nexus can be found, the act will survive the light of constitutional inspection.
Kueckelhan, at 403, 418 P.2d 443. See also Water Dist. 105 v. State, 79 Wash.2d 337, 485 P.2d 66 (1971); State v. Grisby, 97 Wash.2d 493, 647 P.2d 6 (1982), cert. denied sub nom. Frazier v. Washington, 459 U.S. 1211, 103 S.Ct. 1205, 75 L.Ed.2d 446 (1983); Scott v. Cascade Structures, 100 Wash.2d 537, 673 P.2d 179 (1983).
On close examination, however, a nexus between the sections of the legislation and the title is not necessarily instructive.[5] It is *1043 difficult to explain how in Kueckelhan a court can find a nexus between the insurance code, penalties, the Insurance Commissioner's office, and the State Fire Marshall, but in Price v. Evergreen Cemetery Co., 57 Wash.2d 352, 357 P.2d 702 (1960), a court could find no nexus between cemetery endowment care regulations and the establishment of a cemetery board, on one hand, and a prohibition against excluding non-Caucasians from burial, on the other. While there must be a presumption in favor of the validity of legislation, and proponents of legislation should be given wide latitude in defining a "subject" under art. 2, § 19, such latitude should be given to legislators or to the public consistent with the two general principles that underlie art. 2, § 19: notice to the Legislature and to the public, and the prevention of logrolling.
In determining whether or not a rational unity exists between the various subdivisions of a general enactment, courts should consider a number of questions. First, was the process by which the law was enacted open to public involvement? Plainly, greater latitude must be given where a very open and public process was utilized for the enactment of the initiative measure than where an initiative was prepared secretly by various special interest groups.
In Fritz v. Gorton, 83 Wash.2d 275, 517 P.2d 911 (1974), we held that Initiative 276, which provided for a multitude of issues under the general heading of "open government," did not violate art. 2, § 19. The initiative covered disclosure of campaign financing, limitations on campaign spending, regulation of lobbying activities, regulation of grass roots educational activities, disclosure of financial affairs of elected officials, public inspection of public records, and an enforcement process for such activities, including the creation of the Public Disclosure Commission. We stated:
[W]e are satisfied that the interrelated sections easily meet the nexus requirements of the "rational unity" test. In our opinion, the general subject area of Initiative 276 was one reasonably well known and understood by the public. We think that the generic subject of Initiative 276openness in governmentnecessarily encompasses the public accountability of incumbents of public office and candidates seeking to represent the people in public office as well as lobbyists and their employers seeking to guide or direct legislation. Hence, the "rational unity" or coalescence of the initiative's subtopics could be expressed as a general subject or subject area delineating or prescribing more realistic standards and controls, better and more available public information and records regarding election campaigns, the functions of government, involving the activities and societal responsibilities of candidates for public office, public officials, lobbyists and others actively engaged in the processes of government.
Fritz, at 290-91, 517 P.2d 911. The initiative proponents held public meetings, soliciting input from public organizations openly. The organizations supporting the initiative distributed press releases and mailed some 3,000 copies of their proposal to organizations and concerned citizens, including all members of the Washington Legislature, requesting action on open government questions. The organizations made a further effort in the 1972 legislative session to get the Legislature to act. When the Legislature failed to act, the organization filed its initiative, held public meetings, and sought endorsements from elected officials, citizens, organizations, and the newspaper editorial boards. Fritz, at 284-86, 517 P.2d 911. Significantly, the court in Fritz looked outside of the text of the initiative to the process by which it was created, publicized, and passed. Thus, the court could hold, and it was relevant to hold, that the subject of Initiative 276 was "reasonably well known and understood by the public." Fritz, at 290, 517 P.2d 911.
Second, was the public given adequate notice of the contents of the enactment? The evidence of the campaign process, including the voters pamphlet, with respect to initiatives *1044 or referenda, is important to an art. 2, § 19 analysis. If the public knows that certain issues are treated together by the Legislature or initiative proponents, this ensures that the decision-makers are not misled in the enactment of the legislation.
Third, have the issues been considered together historically? In order to forestall logrolling, evidence of how the Legislature treated various subjects of an enactment must be analyzed. For example, whether the Legislature consistently has considered various issues as part of a single subject is relevant. See, Fritz, at 284-86, 517 P.2d 911 (issues of campaign financing, lobbyist regulation, disclosure of campaign data and candidate/official finances, and enforcement all treated together in the process of developing an initiative measure); Scott, at 545-46, 673 P.2d 179 (Legislature treated product Eability law and allocation of fault issues in tort law together through several legislative sessions; court noted that the act related to tort actions with an emphasis on the issue of product liability).
If the legislative or popular enactment incorporates legislation that was in separate bills that were not enacted, such history could indicate logrolling.[6] In Power, Inc. v. Huntley, 39 Wash.2d 191, 235 P.2d 173 (1951), for example, the court examined the legislative history of an act and found that the two portions of the act had separately failed of passage and passed only after being joined. One portion dealt with general appropriations and the other portion, containing 39 sections, enacted a corporate excise tax. This court stated:
This is the clearest possible illustration of the kind of "logrolling," the "you-scratchmy-back-and-I'll-scratch-yours" situation that the constitutional provision was designed to prevent.
Power, at 199, 235 P.2d 173.
Fourth, what was the subject matter of the enactment? The Legislature must be given greater latitude under art. 2, § 19 when the legislation is a budget bill, for example, than a more narrow enactment.[7] Similarly, if the legislation is an omnibus bill designed by the Legislature or the people to address a larger subject area, the wishes of the Legislature or the people in addressing an issue comprehensively in a single bill may be respected. See, e.g., State v. Jenkins, 68 Wash. App. 897, 847 P.2d 488 (1993) (Uniform Controlled Substances Act of 1989 upheld). This latitude has limits. For example, substantive legislation may not be enacted in a budget bill. Flanders, 88 Wash.2d at 188, 558 P.2d at 773; State ex rel. Washington Toll Bridge Auth. v. Yelle, 61 Wash.2d 28, 38, 377 P.2d 466, 472 (1962); State ex rel. Washington Toll Bridge Auth. v. Yelle, 54 Wash.2d at 551, 342 P.2d at 592.
Finally, does the title of the enactment indicate a common unifying theme to the enactment? If the title of the enactment is a "laundry list" of the contents of the legislation, this is suggestive of the possibility that the Legislature or the proponents of a popular enactment could not articulate a single unifying principle for the contents of the measure. Similarly, a law containing subdivisions that allegedly relate to a subject such as "fiscal affairs," "government," or "public welfare" could violate the single-subject provision because the subject matter was excessively general. Harbor v. Deukmejian, 43 Cal.3d 1078, 1099-100, 240 Cal.Rptr. 569, 742 P.2d 1290 (1987), quoting Brosnahan v. Brown, 32 Cal.3d 236, 253, 186 Cal.Rptr. 30, 651 P.2d 274 (1982).
*1045 All of the factors set forth above should be given attention by the courts in determining whether or not a rational unity is present for purposes of art. 2, § 19. No single factor should be elevated above another in determining whether or not the key constitutional principles of notice to the general public and the Legislature and prevention of logrolling are satisfied with respect to a particular enactment.
3. Scope of the Remand
The majority determines that while art. 2, § 19 applies to initiatives and referenda, there was a sufficient record to rule as a matter of law that § 26 of Initiative 134 did not violate art. 2, § 19. In light of my discussion regarding the "rational unity" test, I disagree.[8]
The trial court here ruled on stipulated facts[9] that art. 2, § 19 simply did not apply to initiative measures. Clerk's Papers, at 151, 203. The trial court did not have the opportunity, based on an adequate record, to consider the question of whether § 26 of Initiative 134 was consistent with art. 2, § 19 under the rational unity test. I believe the trial court should be afforded the opportunity to develop a proper factual record on whether § 26 of Initiative 134 complies with art. 2, § 19 of our constitution.
4. Both the Ballot Question and the Legislative Title Are Pertinent in Art. 2, § 19 Cases
In analyzing whether the "title" of Initiative 134 complies with art. 2, § 19, the majority mistakenly lumps together all measures enacted by the people as if only the ballot question can be relevant to a case under art. 2, § 19. Majority opinion, at 10. There is more than one means by which the people may enact a law under art. 2, § 1 of the Constitution. There may be initiatives to the people, initiatives to the Legislature, referenda by the Legislature to the people, and referenda initiated by the people. See generally, Philip A. Trautman, Initiative and Referendum in Washington: A Survey, 49 WASH.L.REV. 55, 56-59 (1973).
Moreover, even an initiative to the Legislature, like Initiative 134, may take several courses. The Legislature may enact the measure as initiated by the people. If the Legislature takes no action with respect to the measure, the measure then goes on the next general election ballot. If the Legislature enacts an alternative to the measure proposed by the people, both the measure proposed by the people and the alternative proposed by the Legislature go on the general election ballot. Plainly, where the Legislature enacts the initiative as proposed by the people, the enactment never goes to the ballot and a ballot question is of no particular utility in discerning the subject matter of the enactment.
Similarly, with respect to referenda, where the Legislature itself refers a question to the people for consideration, the measure has taken the normal course of a bill through the legislative process. The measure's title, as well as the ballot question, is significant in determining the subject matter of the legislation.
For the majority to insist that only the ballot question is relevant establishes too narrow an analytical framework. This is particularly true when, as here, Initiative 134 was an initiative to the Legislature. The majority errs in analyzing the ballot question for Initiative 134 alone, rather than analyzing both the title and the ballot question that was submitted to the voters in 1992.
RCW 29.79.040, which pertains to the formulation of the ballot question and summary for initiatives and referenda, does not purport to make the ballot question the exclusive means of interpreting the subject of an enactment. The statute makes specific reference to the "legislative title of the measure" *1046 as well as the ballot question. In State ex rel. Seymour v. Superior Court, 168 Wash. 361, 12 P.2d 394 (1932), this court held that for an initiative, the intent of the act may be discerned from the legislative title. The court considered both the legislative title and the ballot title in analyzing an initiative under art. 2, § 19. Seymour, at 364-65, 12 P.2d 394. This is the proper rule for this case. To the extent that it is contradictory, State v. Charboneau's, 27 Wash.App. 5, 615 P.2d 1321, review denied, 94 Wash.2d 1021 (1980), should be overruled.
In this case, the legislative title to Initiative 134 was:
An act relating to the regulation of political contributions and campaign expenditures.
Clerk's Papers, at 88. The ballot question was:
Shall campaign contributions be limited; public funding of state and local campaign be prohibited; and campaign related activities be restricted?
Clerk's Papers, at 81, 85.
In the present case, the trial court should review both the legislative title and the ballot question to determine if the title of Initiative 134 adequately apprised the voters that § 26 was a part of the measure.

CONCLUSION
Art. 2, § 19 of the Washington Constitution is a crucial part of a comprehensive effort by the Framers of the Constitution to ensure the open enactment of legislation and to prevent logrolling. These goals are pertinent whether the legislation is enacted by the Legislature or the people. This court should reverse the trial court's judgment and remand the case to the trial court for further proceedings consistent with the analytical framework for art. 2, § 19 challenges set forth herein.
JOHNSON, J., and UTTER, J. Pro Tem., concur.
NOTES
[1] A third organization representing civil service employees of the State, the Washington Public Employees Association, was an intervenor/plaintiff, but did not appeal.
[2] RCW 29.79.040 was amended by Laws of 1993, ch. 256, § 9, and no longer requires that the ballot title consist of a statement not to exceed 20 words.
[1] In 1994, the proponents of Initiative 634 proposed, in a single measure, to require performance audits of state governmental agencies; to authorize the contracting out of state services; to prohibit competition by governmental agencies with private sector businesses; to amend various portions of the state's Administrative Procedure Act to accomplish "regulatory reform"; to award attorney fees to parties challenging state agency actions; to grant new authority to the Legislature's Joint Administrative Rules Review Committee with respect to administrative rules; to create a Competitive Strategies Commission to insure that the state was not guilty of unfair competition with private businesses; to limit the growth of employment by state government; to prohibit strikes by state employees; to make changes in the laws regarding use of public facilities for campaigning and lobbying; to reaffirm the principles of Initiative 134 with respect to campaign financing; to require the Legislature to discover $100 million in savings of governmental expenditures from a variety of sources; to spend $60 million to increase prison capacity generally, and especially for violent juvenile offenders; and to spend $40 million for distribution to local governments for the purpose of community and neighborhood protection from violent crime and for the implementation of measures designed to increase penalties and time served by violent juvenile criminal offenders. Initiative 634 was entitled "An act relating to achieving efficiency and eliminating waste in state government and funding law enforcement and prison construction." That widely disparate programs and purposes were brought together under Initiative 634 is rather an understatement. Initiative 634 was widely circulated, although it did not reach the 1994 general election ballot.
[2] See also Mark Slonim & James H. Lowe, Comment, Judicial Review of Laws Enacted by Popular Vote, 55 WASH.L.REV. 175 (1979) (arguing for heightened scrutiny under equal protection for popularly enacted laws because of potential threat to individual and minority rights).
[3] The late Lieutenant Governor John Cherberg frequently articulated the "Cherberg Rule" on scope and object to members of the Senate:

"Senate Rule 65 contains the exact language of Article 2, Section 38 of the Washington State Constitution, and reads as follows: `No amendment to any bill shall be allowed which shall change the scope and object of the bill.'
"As presiding officer of the Washington State Senate, it is my duty to rule on any point of order which raises the question of whether an amendment changes the scope and object of a bill. The scope of a bill refers to the boundaries or limits of the legislation, sometimes referred to as a bill's ultimate intention. The object of legislation is its aim, purpose, end or goal.
"It is important to note that the Constitution and Rule are not concerned with the title of a bill. Frequently, legislators believe an amendment is in order because the title is broad, without fully realizing that the provisions do not pertain to the title, but to the bill itself.
"The reasoning behind the provisions are clear. If amendments which are foreign to the substance of a bill are permitted, the entire legislative process, including the important considerations by committees, could be avoided. Legislative `logrolling' or `paperhanging' is prevented by properly adhering to the letter and spirit of the provisions. The Constitution and Rule aim to prohibit amendments to a measure intended to secure enough votes when there may not be a majority of members favoring the measure or the amendment on their own. If a measure cannot stand on its own merits, it should not pass and this is what the Constitution and our Rule seek to prevent.
Senate Journal, 50th Legislature (1988), at 761.
[4] Since 1891, only nine supreme court cases have found that legislation contained more than one subject. Barde v. State, 90 Wash.2d 470, 472, 584 P.2d 390 (1978) (dognapping and attorney fees for replevin of property from a pawnbroker lacked rational unity); Flanders v. Morris, 88 Wash.2d 183, 188, 558 P.2d 769 (1977) (change in eligibility for public assistance and supplemental appropriations); Price v. Evergreen Cemetery Co., 57 Wash.2d 352, 357 P.2d 702 (1960) (bill prohibiting refusal to bury non-Caucasian and regulations on cemeteries held two subjects); State ex rel. Washington Toll Bridge Authority v. Yelle, 54 Wash.2d 545, 342 P.2d 588 (1959) (budget act contained continuing authority for Authority to pledge fuel tax proceeds to guarantee bonds); Washington Toll Bridge Authority v. State, 49 Wash.2d 520, 304 P.2d 676 (1956) (continuing authority for toll roads in general, and providing specifically for a toll road from Tacoma to Everett); Power, Inc. v. Huntley, 39 Wash.2d 191, 235 P.2d 173 (1951) (appropriations and corporate excise tax); State ex rel. Washington Toll Bridge Authority v. Yelle, 32 Wash.2d 13, 200 P.2d 467 (1948) (statute authorizing acquisition of bridges and ferries); Swedish Hospital v. Dep't of Labor & Indus., 26 Wash.2d 819, 176 P.2d 429 (1947) (expanding workers' compensation to those with hazardous jobs in both charitable and non-profit institutions); State ex rel. Henry v. MacDonald, 25 Wash. 122, 64 P. 912 (1901) (establishing public schools and making it a crime to fail without good cause to send child to school).

Across America, only a handful out of hundreds of challenges to laws based upon the single-subject provisions are successful. Ruud, No Law Shall Embrace More Than One Subject, 42 MINN.L.REV. 389, 447 (1958) (hereinafter "Ruud").
[5] Forty-two states have single-subject provisions in their constitutions. Courtney P. Odishaw, Curbing Legislative Chaos: Executive Choice or Congressional Responsibility, 74 IOWA L.REV. 227, 240 (1995). Decisions from these 42 states exhibit an "inability to define `single subject' precisely." Odishaw, at 242. The problem is single-subject is a subjective term; "any combination of concepts and things may appropriately be regarded as a `subject' so long as there are people who find it expedient to so classify them." Lowenstein, California Initiatives and the Single-Subject Rule, 30 UCLA L.Rev. 936, 939 (1983).
[6] Some cases look to "past legislative practice in dealing with the matters included in the bill under discussion, and, finding that there was a settled legislative practice of treating them separately, have declared the acts to contain more than one subject." Ruud, at 408, citing Atlantic City & S.R.R. v. State Bd. of Assessors, 88 N.J.L. 219, 96 A. 568 (1916) (30 years' practice of treating street and steam railroads differently). "The fact that the matters have always been dealt with separately in the past does suggest that the reason for their being combined for the first time in one bill is log-rolling." Ruud, at 408-09.
[7] Ruud notes that usually the single-subject rule is not used to invalidate appropriations bills, revisions of a statutory code dealing with a branch of the law, or revenue acts. Ruud, at 441-43. Government could not function well if these types of acts had to be passed piecemeal.
[8] I agree with the majority's analysis of the constitutionality of RCW 29.79.060 here, and the majority's treatment of § 26 of the initiative under art. 1, § 23 of our constitution.
[9] Clerk's Papers, at 27-149. The bulk of the record is a sample Voter's Pamphlet. Clerk's Papers, at 78-149. Aside from statements by affiants that they were unaware from the ballot question that Initiative 134 contained § 26, Clerk's Papers, at 36-37, 45, 48-49, 52-53, 67-68, the record is devoid of evidence pertinent to the analysis of art. 2, § 19 set forth herein.