171 P.3d 486 (2007)
WASHINGTON CITIZENS ACTION OF WASHINGTON, a Washington non-profit corporation; Welfare Rights Organization Coalition, a Washington nonprofit corporation; 1000 Friends of Washington, a Washington non-profit organization; and Whitman County, Respondents,
v.
The STATE of Washington, and William Rice, Director of the State Department of Revenue, Appellants.
No. 78844-8.
Supreme Court of Washington, En Banc.
November 8, 2007.
*487 James Kendrick Pharris, Timothy Dunning Ford, Office of Attorney General, Cameron Gordon Comfort, Atty Generals Ofc/Revenue Division, Olympia, WA, for Appellants.
Eric D. `knoll' Lowney, Attorney at Law, Gwynne L. Skinner, Ronald A. Peterson Law Clinic, Seattle U, Nancy S. Chupp, Public Interest Law Group PLLC, Seattle, WA, for Respondents.
Daniel Brian Heid, Auburn, WA, Kathleen J. Haggard, Dionne & Rorick, Seattle, WA, for Amicus Curiae on behalf of Washington State Assoc of Municipal Attorneys, Amicus Curiae on behalf of Association of Wash Cities and Wash Assoc of Counties, and Amicus Curiae on behalf of Washington Association of Counties.
BRIDGE, J.
¶ 1 Property taxes are levied each year by the state and by local governments based on the assessed value of a piece of property. Chapter 84.55 RCW limits the rate at which each taxing district, including the State, may increase the regular property tax levy amount. Initiative 747 (I-747), passed in 2001, attempts to amend chapter 84.55 RCW to generally limit state and local property tax levy increases to one percent per year.
¶ 2 Washington Citizens Action Welfare Rights Organization Coalition, 1000 Friends of Washington,[1] and Whitman County challenge the constitutionality of I-747. Article II, section 37 of the Washington Constitution *488 requires that amendatory laws set forth at full length the law to be amended. I-747's challengers argue that the initiative failed to accurately set forth the law that it sought to amend in violation of article II, section 37 because the text of the initiative claimed to reduce the general property tax levy limit from two percent to one percent, but in reality it reduced the limit from six percent to one percent. We agree. While the challengers also assert that I-747 violated article II, section 19's subject in title requirement, we need not address that argument in this case.

I

Facts and Procedural History
¶ 3 Central to this case is the recent history of chapter 84.55 RCW (Limitations Upon Regular Property Taxes). Prior to 1997, chapter 84.55 RCW provided:
Except as provided in this chapter, the levy for a taxing district in any year shall be set so that the regular property taxes payable in the following year shall not exceed one hundred six percent of the amount of regular property taxes lawfully levied for such district in the highest of the three most recent years. . . .
Former RCW 84.55.010 (effective in 1996). The statute allowed for additional calculations based on new construction, property improvements, and any increase in assessed value of state-assessed property, but generally, the statute limited property tax increases to a levy of six percent above the total amount levied in the highest of the three previous years. Unless otherwise noted in a particular chapter or section, the term "[t]axing district" as used in Title 84 RCW, referred to both the state and municipal corporations with the power to impose property taxes. Former RCW 84.04.120 (effective in 1996). Finally, former RCW 84.55.050 (effective in 1996) allowed regular property taxes to be levied in an amount exceeding the limits set forth in chapter 84.55 RCW if authorized by voters of the taxing district at an election. Former RCW 84.55.050 (effective in 1996).
¶ 4 In 1997, the voters approved Referendum 47, amending chapter 84.55 RCW. Instead of a simple six percent limit, the referendum imposed a "limit factor" on property tax increases, defined as:
(a) For taxing districts with a population of less than ten thousand in the calendar year prior to the assessment year, one hundred six percent;
(b) For taxing districts for which a limit factor is authorized under section 204 of this act [set forth below], the lesser of the limit factor authorized under that section or one hundred six percent;
(c) For all other districts, the lesser of one hundred six percent or one hundred percent plus inflation.
LAWS OF 1997, ch. 3, § 201(2). Section 204 of Referendum 47 added a new section to chapter 84.55 RCW, creating an avenue for taxing districts other than the State to increase property taxes by a rate higher than the rate of inflation, but still equal to or less than six percent:
Upon a finding of substantial need, the legislative authority of a taxing district other than the state may provide for the use of a limit factor under this chapter of one hundred six percent or less. In districts with legislative authorities of four members or less, two-thirds of the members must approve an ordinance or resolution under this section. In districts with more than four members, a majority plus one vote must approve an ordinance or resolution under this section. The new limit factor shall be effective for taxes collected in the following year only.
Id. § 204. Referendum 47 limited the levy for a taxing district such that "regular property taxes payable in the following year shall not exceed ((one hundred six percent of)) the limit factor multiplied by the amount of regular property taxes lawfully levied for such district in the highest of the three most recent years." Id. § 202. Like its predecessor, Referendum 47 allowed for additional calculations based on new construction, property improvements, and any increase in assessed value of state-assessed property. Id. Referendum 47 did not alter the definition of "taxing district" and it emphasized that former *489 RCW 84.55.050's voter approval mechanism could be used to increase property taxes above the limit factor. Id. § 208; former RCW 84.04.120 (effective in 1998); former RCW 84.55.050 (effective in 1998).
¶ 5 Thus, after Referendum 47, property tax increases were generally limited to a rate amounting to the lesser of inflation or six percent in most districts. Small taxing districts were limited by only six percent. Larger taxing districts (other than the State) could increase their property tax levy by a rate above the level of inflation up to six percent with a finding of substantial need, and all taxing districts, including the State, could increase property taxes above the six percent limit with voter approval.
¶ 6 Then, on November 7, 2000, the voters adopted Initiative 722 (I-722). City of Burien v. Kiga, 144 Wash.2d 819, 822-23, 31 P.3d 659 (2001). The portion of I-722 relevant to this case purported to amend chapter 84.55 RCW's definition of "[l]imit factor" by replacing all six percent increase limits with two percent increase limits. LAWS OF 2001, ch. 2, §§ 5-6. I-722 generally limited property tax increases to a rate amounting to the lesser of inflation or two percent. Small taxing districts would be limited by only the two percent cap. And if the rate of inflation were to fall below two percent, then larger taxing districts (other than the State) could increase their rate of property tax increase above the level of inflation up to two percent with a finding of substantial need.
¶ 7 Several municipal corporations, cities, counties, and nonprofit organizations challenged the constitutionality of I-722, and on November 30, 2000, the Thurston County Superior Court entered a preliminary injunction against the implementation or enforcement of I-722. Kiga, 144 Wash.2d at 823, 31 P.3d 659. In response, sponsors of I-722 contemplated a new property tax initiative for the 2001 ballot, apparently intending to provide a safety net if I-722 were declared unconstitutional. January 6, 2001, was the first day that 2001 initiatives could be filed with the secretary of state. See RCW 29A.72.030. On January 11, 2001, several weeks after the preliminary injunction against I-722 took effect, Permanent Offense filed I-747.
¶ 8 I-747's official ballot title read as follows:
Initiative Measure No. 747 concerns limiting property tax increases. This measure would require state and local governments to limit property tax levy increases to 1% per year, unless an increase greater than this limit is approved by the voters at an election.
Should this measure be enacted into law? Yes [] No []
State of Washington Voters Pamphlet, General Election 4 (Nov. 6, 2001) (Voters' Pamphlet).[2] Section 2 of I-747 explains that:
RCW 84.55.005 and 2001 c 2 s 5 (Initiative Measure No. 722) are each amended to read as follows:
. . . .
(2) "Limit factor" means:
(a) For taxing districts with a population of less than ten thousand in the calendar year prior to the assessment year, one hundred ((two)) one percent;
(b) For taxing districts for which a limit factor is authorized under RCW 84.55.0101, the lesser of the limit factor under that section or one hundred ((two)) one percent;
(c) For all other districts, the lesser of one hundred ((two)) one percent or one hundred percent plus inflation. . . .
Id. at 14-15. Section 3 of the initiative amended "RCW 84.55.0101 and 2001 c 2 s 6 (Initiative Measure No. 722)" to read:
Upon a finding of substantial need, the legislative authority of a taxing district other than the state may provide for the use of a limit factor under this chapter of one hundred ((two)) one percent or less unless an increase greater than this limit is approved by the voters at an election as provided in RCW 84.55.050. In districts with legislative authorities of four members or less, two-thirds of the members must approve an ordinance or resolution *490 under this section. In districts with more than four members, a majority plus one vote must approve an ordinance or resolution under this section. The new limit factor shall be effective for taxes collected in the following year only.
Id. at 15. I-747 did not amend the definition of "[t]axing district" or alter RCW 84.55.050's provision allowing a taxing district to exceed chapter 84.55 RCW's levy increase limit by way of voter approval. RCW 84.04.120; RCW 84.55.050. Only section 1 of the initiative text, the "Policies and Purposes" section, referred to the pre-I-722 limit, complaining that "taxing authorities regularly increase property taxes to the maximum limit factor of 106%." Voters' Pamphlet at 14.
¶ 9 Permanent Offense began collecting signatures for I-747. Then, on February 23, 2001, the Thurston County Superior Court ruled that I-722, the initiative generally effecting a two percent limit on property tax levy increases, was unconstitutional. Kiga, 144 Wash.2d at 824, 31 P.3d 659. The superior court ordered a permanent injunction against implementation and enforcement of I-722. Id. The last date that signatures could be submitted for I-747 was July 6, 2001. See Wash. Const. art. II, § 1(a). Thus, the permanent injunction took effect more than four months before voter signatures were due to the secretary of state for 2001 initiatives. See id.
¶ 10 I-722 proponents sought direct review, and on June 12, 2001, this court heard oral argument on the constitutionality of I-722. Kiga, 144 Wash.2d at 824, 31 P.3d 659. On September 20, 2001, after the I-747 petition signatures had been submitted to the secretary of state, this court issued its decision in Kiga, affirming the trial court and concluding that I-722 was unconstitutional because it embodied two unrelated subjects in violation of article II, section 19 of the Washington Constitution. Id. at 827-28, 31 P.3d 659. Thus, I-722's property tax increase limitation never took effect and the definition of limit factor remained either six percent or the lesser of six percent or the rate of inflation, depending on the size of the taxing district. On November 6, 2001, several weeks after we published Kiga, the voters passed I-747, the text of which still asserted an intention to reduce I-722's general two percent limit to one percent.
¶ 11 In January 2005, three nonprofit corporations and Whitman County challenged the constitutionality of I-747 in King County Superior Court. The challengers argued that the initiative violated article II, section 37 of the Washington Constitution, which requires an initiative to fully set forth the acts or sections it seeks to amend, and article II, section 19 of the Washington Constitution, which requires in part that the subject of an initiative be accurately expressed in its ballot title. The State defended I-747, and Permanent Offense did not intervene. The challengers and the State filed cross motions for judgment on the pleadings, and the trial court ruled in favor of the challengers. Specifically, the trial court held that I-747 violated article II, section 37 because the text of I-747 told voters that they were reducing the general property tax levy increase cap from two percent to one percent rather than from six percent to one percent. Because the trial court concluded that I-747 violated article II, section 37, it declined to address whether the initiative also violated article II, section 19.
¶ 12 The State filed a notice of appeal in this court, and we retained the case for direct review. Our commissioner also approved a stipulated order staying judgment pending appeal.

II

Analysis
¶ 13 We review constitutional questions and the interpretation of initiative measures de novo. Pierce County v. State, 150 Wash.2d 422, 429, 78 P.3d 640 (2003) (Pierce County I). An initiative challenger bears the heavy burden of establishing unconstitutionality of the initiative beyond a reasonable doubt. Pierce County v. State, 159 Wash.2d 16, 27, 148 P.3d 1002 (2006) (Pierce County II). We do not review initiative measures under more or less scrutiny than legislatively enacted bills. Citizens for Responsible Wildlife Mgmt. v. State, 149 Wash.2d 622, 631, 71 P.3d 644 (2003). Where interpretation of the meaning of the initiative *491 is required, we focus on the language "as the average informed voter voting on the initiative would read it." Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 205, 11 P.3d 762, 27 P.3d 608 (2000).
¶ 14 Article II, section 37 provides, "[n]o act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length." Article II, section 37 applies equally to the legislative and initiative processes. State v. Thorne, 129 Wash.2d 736, 752-53, 921 P.2d 514 (1996). As the State explains, article II, section 37 was intended to avoid amendatory legislation that merely substituted one phrase for another, without examination of the original statute, such that the amendatory statute, standing alone, conveyed no meaning at all. Yelle v. Bishop, 55 Wash.2d 286, 299-300, 347 P.2d 1081 (1959); Corrected Br. of Appellant at 4. Yet more recently, we have also held that article II, section 37 is intended both to ensure disclosure of the general effect of the new legislation and to show its specific impact on existing laws in order to avoid fraud or deception. Wash. Ass'n of Neighborhood Stores v. State, 149 Wash.2d 359, 373, 70 P.3d 920 (2003); Citizens for Responsible Wildlife Mgmt., 149 Wash.2d at 640, 71 P.3d 644.
Citizens or legislators must not be required to search out amended statutes to know the law on the subject treated in a new statute. Under article II, section 37, a new statute must explicitly show how it relates to statutes it amends.

Wash. Ass'n of Neighborhood Stores, 149 Wash.2d at 373, 70 P.3d 920 (emphasis added); see also Wash. Educ. Ass'n v. State, 93 Wash.2d 37, 39, 604 P.2d 950 (1980). Thus, a significant purpose of article II, section 37 is to ensure that those enacting an amendatory law are fully aware of the proposed law's impact on existing law.
¶ 15 Recently, in Pierce County II, 159 Wash.2d at 40-41, 148 P.3d 1002, we addressed an argument similar to the one set forth by the challengers in this case. In Pierce County II, challengers asserted that I-776 violated the state constitution because it impaired an existing contract between Central Puget Sound Regional Transit Authority (Sound Transit) and its bondholders. Id. at 22, 148 P.3d 1002. In an attempt to defend the initiative, interveners argued that Sound Transit's bond contract was invalid because the statute enabling the creation of Sound Transit was invalid. Id. at 39, 148 P.3d 1002. Sound Transit's enabling statute had been amended in 1993 and 1994. Id. at 39-40, 148 P.3d 1002. The interveners argued that the 1993 amendment was unconstitutional, but we held that any defect in the 1993 amendments was cured by the 1994 legislation. Id. at 40-41, 148 P.3d 1002. Even so, the interveners also asserted that the 1994 amendment
was ineffective, violating Washington Constitution article II, section 37 because it did not reprint the full text of RCW 81.112.030, the statute in effect in 1992. Instead, the 1994 act reprinted the full text of RCW 81.112.030, the amended section that was effective in 1993.
Id. at 41, 148 P.3d 1002 (footnote omitted). Thus, the interveners argued, the 1994 amendment did not fully set forth the version of the relevant statute that it actually amended because the 1993 version set forth in the bill was unconstitutional. Instead, the 1994 act should have set forth the most recent valid version, namely the 1992 version. See id.
¶ 16 In response to this argument, we explained:
Washington Constitution article II, section 37 requires the legislature to set forth the full length of the relevant act or section to be amended. Since the 1994 legislature was entitled to assume that the 1993 act was constitutional, the legislature properly complied with article II, section 37 by setting forth the relevant section effective at the time of the legislature's action. Accordingly, we find no constitutional infirmity with the enabling statute.
Id. at 41, 148 P.3d 1002 (emphasis added) (citation omitted). In Pierce County II, we made it clear that so long as a proposed law accurately sets forth the law it seeks to amend as it existed "at the time of the legislature's action," then a later determination that the amended law was unconstitutional is *492 immaterial for purposes of article II, section 37. See id.
¶ 17 The Pierce County II court did not specify what constitutes the legislative action at which compliance with article II, section 37 is required. No party in that case argued that the version of the statute that the legislature was seeking to amend was unconstitutional until well after the 1994 amendatory legislation was voted on and took effect. See id. at 41, 148 P.3d 1002. In contrast, in this case, this court declared I-722 unconstitutional before voters passed I-747, which purported to amend I-722. Therefore, we must determine whether the legislative action described in Pierce County II occurs at the time an initiative is filed, as the State suggests, or at the time of the operative vote, as I-747's challengers suggest.
¶ 18 No other article II, section 37 cases specifically address when compliance with the provision should be evaluated. However, when discussing the impact of another constitutional provision, article II, section 19, on the initiative process, we have emphasized that the relevant legislative action is the operative vote. For example, when evaluating the sufficiency of an initiative's title, we have held that the ballot title will be evaluated when the initiative is an initiative to the people because "it is the ballot title with which voters are faced in the voting booth." Wash. Fed'n of State Employees v. State, 127 Wash.2d 544, 555, 901 P.2d 1028 (1995). In contrast, the legislative title will be evaluated when the initiative is to the legislature, even though a different title may have been presented to petition signers. State v. Broadaway, 133 Wash.2d 118, 125-26, 942 P.2d 363 (1997). Therefore, when evaluating the constitutionality of a measure under article II, section 19, we have focused on the understanding of the voters at the time of the vote on enactment, not on the understanding of initiative proponents or petition signers. See also Brower v. State, 137 Wash.2d 44, 70, 969 P.2d 42 (1998). Given the common purpose supporting article II, section 19 and article II, section 37, to ensure that those voting on legislation are not deceived or misled, it is common sense to extend this reasoning to article II, section 37 cases, evaluating compliance at the time of the vote rather than at the time of filing, and we so hold.
¶ 19 Here, at the time of the popular vote, the text of I-747 did not accurately set forth the law that the initiative sought to amend. Voters' Pamphlet at 15. The text of I-747 led voters to believe that I-747 would generally reduce the property tax increase limit from two percent to one percent. Id. In fact, the initiative generally reduced the property tax increase limit from six percent to one percent. Id.; Kiga, 144 Wash.2d at 827-28, 31 P.3d 659.
¶ 20 The State contends that, nevertheless, the purpose of article II, section 37 was satisfied in this case because the Voters' Pamphlet made it clear that there was an ongoing challenge to the validity of I-722, and if that law were struck down, I-747 would have the impact of reducing the property tax increase limit from the lesser of six percent or inflation to the lesser of one percent or inflation for most districts. The State is correct that despite the text of sections 2 and 3 of I-747, section 1, the "Policies and Purposes" section, complains that "taxing authorities regularly increase property taxes to the maximum limit factor of 106%." Voters' Pamphlet at 14. Moreover, the "Argument For" and the explanatory statement created by the attorney general and set forth in the Voters' Pamphlet refer to existing law as the six percent increase limit rather than I-722's two percent increase limit. Id. at 4-5. The attorney general's summary, apparently drafted before our decision in Kiga was published, also explains that I-722 would have lowered the increase limit to two percent but that the constitutionality of I-722 was then-pending before this court. Id. at 5.
¶ 21 While complete review of the attorney general's explanatory statement in the Voters' Pamphlet might have explained the relationship between pre-I-722 law and the changes proposed by I-747, article II, section 37 does not simply require that notice of an amendatory initiative's impact on existing law be somehow available to voters. "[T]he act revised or the section amended" must be "set forth at full length." WASH. CONST. art. II, § 37. Nothing in the plain language *493 of article II, section 37 or in our case law interpreting it suggests that information in the Voters' Pamphlet can cure the type of textual violation of article II, section 37 that occurred here, where the initiative's inaccuracy strikes at the substance of the amendment's impact. Moreover, we have previously acknowledged that many voters do not read the Voters' Pamphlet when evaluating an initiative or referendum. See, e.g., Wash. Fed'n of State Employees, 127 Wash.2d at 554, 901 P.2d 1028. Here, if a voter simply read the text of the initiative, he or she would have understood that I-747 reduced the property tax levy limit from two percent to one percent. Simply put, a voter reading the text of the initiative would have perceived a much smaller impact on government coffers than would actually occur under I-747, a fact the dissent ignores. The text of the initiative misled voters about the substantive impact of the initiative on existing law.
¶ 22 But even if we could assume that article II, section 37 allows a substantive error in the text of an initiative to be explained in other portions of the Voters' Pamphlet, the aggregate information provided in the pamphlet for I-747 is ambiguous. In its purpose section, the text of the initiative refers to the six percent limit, but the operative section actually amending the general property tax levy limit reduces the limit from two percent to one percent. Voters' Pamphlet at 14-15. The "Statement For" complains that taxing districts have consistently increased taxes by six percent per year, but it does not explain why the text of the initiative refers to reduction from a two percent limit. Voters' Pamphlet at 4. The attorney general's explanatory statement discusses the six percent limit, but it also explains that at the time, I-722's two percent limit was being challenged in the courts and was not in force. Voters' Pamphlet at 5. The explanatory statement is then contradicted by the text of the initiative, which purports to reduce the general limit from two percent to one percent. Voters' Pamphlet at 15. At best, review of the entire Voters' Pamphlet reveals ambiguity as to the effect that I-747 would have on existing law. Compare Voters' Pamphlet at 5 with Voters' Pamphlet at 15. We, therefore, conclude that the Voters' Pamphlet does not cure the defect in the text of I-747.
¶ 23 The State asserts that article II, section 37 should not be used to "`trammel or hamper'" the enactment of laws, Yelle, 55 Wash.2d at 300, 347 P.2d 1081 (quoting Spokane Grain & Fuel Co. v. Lyttaker, 59 Wash. 76, 82, 109 P. 316 (1910)), and that our analysis ignores the rights of initiative proponents and could frustrate the initiative process. See Schrempp v. Munro, 116 Wash.2d 929, 935, 809 P.2d 1381 (1991). The State contends that legislation is presumed to be constitutional, and Permanent Offense justifiably relied on this presumption when it filed I-747 with the secretary of state and then collected signatures. See Lemon v. Kurtzman, 411 U.S. 192, 209, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) ("[S]tate officials and those with whom they deal are entitled to rely on a presumptively valid state statute, enacted in good faith and by no means plainly unlawful."). The State asks what option is available to initiative proponents where the law that they would like to amend has been challenged in the courts.
¶ 24 We acknowledge that there is no mechanism for amendment of the text of an initiative after an initiative is filed. WASH. CONST. art. II, § 1(a); RCW 29A.72.010, .030.[3] Yet, initiative proponents can effectively "amend" an initiative simply by filing a new version of an initiative under a different number. Proponents then gather signatures on only their preferred version of the proposed initiative. See Suppl. Designation of Clerk's Papers.
*494 ¶ 25 In this case, the trial court declared I-722 unconstitutional and entered a permanent injunction on February 23, 2001, more than four months before initiative signatures had to be submitted to the secretary of state. Thus, I-747's challengers argue, I-747 proponents were not justified in presuming I-722 was constitutional under these particular circumstances, where a trial court had declared I-722 unconstitutional arguably early enough that I-747 proponents could have filed a new initiative purporting to amend the pre-I-722 version of the law rather than I-722.
¶ 26 In response, the State contends that I-747 proponents were entitled to presume that I-722 was constitutional until this court ruled otherwise in September 2001 and that even if there was time to propose an alternative initiative, I-747 proponents would have had to correctly guess whether this court would uphold or strike down I-722. The challengers respond that the practical way to avoid this guessing game is to wait for the constitutionality of existing law to be finally resolved before introducing a new initiative to amend that law.[4] In turn, the State contends that initiative proponents should not have to suffer such a delay.
¶ 27 The very purpose of article II, section 37 is to avoid misleading voters or legislators as to the effect an initiative will have on existing law. Wash. Ass'n of Neighborhood Stores, 149 Wash.2d at 373, 70 P.3d 920; see also Wash. Educ. Ass'n, 93 Wash.2d at 39, 604 P.2d 950. This court long ago recognized
The people in their legislative capacity are not . . . superior to the written and fixed constitution. Nor is the individual who proceeds to initiate any legislation. His act in initiating a measure is but a voluntary one, and is permitted and defined, limited and circumscribed, by the constitution and the laws passed in obedience to and compliance with the constitution.
State ex rel. Berry v. Superior Court, 92 Wash. 16, 26, 159 P. 92 (1916). Although we presume the validity of initiative measures and respect the right of Washington's citizens to exercise this important privilege, article II, section 37 was designed to protect voters and legislators from confusing or misleading information and to maintain the integrity of the law-making process. Thus, where we must weigh delay for initiative proponents against constitutionally prescribed clarity for the voters, the constitution must prevail.
¶ 28 The State contends that regardless of article II, section 37's purpose, I-747's challengers have not shown that the initiative violated the constitutional provision in light of the test that this court has adopted for evaluating article II, section 37 cases. We have typically analyzed, as an initial matter, whether the legislation at issue is amendatory of prior acts or complete in and of itself, thereby making the new legislation exempt from the article II, section 37 requirement. Citizens for Responsible Wildlife Mgmt., 149 Wash.2d at 641, 71 P.3d 644.
First, the court must determine whether the bill is such a complete act that the scope of the rights created or affected by the bill can be ascertained without referring to any other statute or enactment. Second, would a determination of the scope of the rights under the existing statutes be made erroneous by the bill?
Id. (citation omitted). Both parties in this case acknowledge that I-747 was amendatory and not independently complete because the initiative clearly amended RCW 84.55.005 and RCW 84.55.0101. Reply Br. of Appellants at 3-4 ("The state does not contend that I-747 is exempt from requirements of article II, section 37, only that it does not violate any of its requirements."). The State asserts that, even so, the initiative challengers have not established that I-747 violated the second prong of the above test. The purpose of the second prong is to ensure that those impacted by a particular existing law can evaluate the impact of the proposed amendment on that existing law. Amalgamated Transit, 142 Wash.2d at 246, 11 P.3d 762. *495 Despite the State's attempts to characterize the second prong otherwise, both prongs of the test were developed to determine whether proposed legislation is amendatory in character. Nothing about the test speaks to whether a clearly amendatory act such as this one has adequately or correctly set forth the law that it seeks to amend. Applying the above test, we conclude that the parties were correct to conclude I-747 is amendatory in character and thus article II, section 37 is applicable.
¶ 29 The State asserts that even though I-722 was declared unconstitutional, we should deem it to have remained effective for purposes of evaluating its successor under article II, section 37. Again, emphasizing the interests of initiative proponents, the State asserts that proponents should have been entitled to rely on I-722 for purposes of article II, section 37, even if it turned out to be unconstitutional. In contrast, the trial court applied the principle that a statute that has been declared unconstitutional is inoperative as if it had never been passed. Clerk's Papers at 203 (citing Boeing Co. v. State, 74 Wash.2d 82, 88, 442 P.2d 970 (1968)). Again, a focus on the purpose of article II, section 37 helps to resolve this dispute. The constitutional provision was intended to ensure that legislators and voters are apprised of the impact that an amendatory law will have on existing law. Amalgamated Transit, 142 Wash.2d at 246, 11 P.3d 762. In this case, the intervening decision in Kiga rendered the text of I-747 inaccurate in its explanation of the initiative's impact on existing law. Considering the purpose of article II, section 37, we must take Kiga into account when evaluating compliance with article II, section 37.[5]
¶ 30 The State argues that if we agree with the challengers, our holding will create a domino effect; every time a former law has been declared unconstitutional, any subsequent amendments to the unconstitutional law would also be invalid. Corrected Br. of Appellants at 14 n. 12. Similarly, the State contends that our analysis will result in frustration of the legislative process,[6] for example preventing the legislature from passing two bills amending the same law in the same legislative session.[7] However, the Pierce County II court made it clear that where an amendatory act is concerned, so long as the proposed legislation accurately sets forth the law being amended at the time of the relevant legislative action, which we hold is the operative vote, then article II, section 37 is satisfied. Pierce County II, 159 Wash.2d at 41, 148 P.3d 1002. Our holding today impacts only cases in which an amendatory statute inaccurately sets forth the law to be amended as measured at the time of the operative vote.
¶ 31 In sum, the purpose of article II, section 37 is to avoid misleading those voting on a proposed law by ensuring disclosure of the general effect of the new legislation and *496 by showing its specific impact on existing laws. Citizens for Responsible Wildlife Mgmt., 149 Wash.2d at 640-41, 71 P.3d 644; Wash. Ass'n of Neighborhood Stores, 149 Wash.2d at 373, 70 P.3d 920. Because article II, section 37 is intended to protect those who are to vote on amendatory legislation from fraud and deception, we consider compliance with the provision at the time of the operative vote. In this case, at the time of the popular vote on I-747, the text of the initiative misled voters as to the effect that I-747 would have on existing law. Voters' Pamphlet at 15. Instead of advising voters that I-747 would generally reduce the property tax increase limit from six percent to one percent, the text of I-747 purported to generally reduce the property tax increase limit from two percent to one percent. Id. A voter reading the text of the initiative could believe that he or she was voting to reduce the property tax limit by one percent instead of by five percent, a substantially different impact on the public coffers, as well as the perceived benefit to the individual voter's purse. See id.
¶ 32 We acknowledge that only in rare cases will an amendatory initiative or bill be impacted by an intervening determination that the law to be amended is unconstitutional. However, in those rare circumstances, article II, section 37 protects legislators and voters by insisting that amendatory legislation accurately set forth the law to be amended as measured at the time of the enacting vote. We hold that I-747 violates article II, section 37 of the Washington Constitution. Because we conclude that I-747 violated article II, section 37, then we need not address whether it also violated article II, section 19.

III

Conclusion
¶ 33 While the interests of initiative proponents are significant, a central purpose of article II, section 37 is to protect the electorate  those voting on a proposed law  from being misled as to its effect on existing law. Thus, we measure compliance with the constitutional provision at the time that the voter makes this important decision. In this case, at the time of the operative popular vote, the text of I-747 did not accurately set forth the act revised or the section amended and the text of I-747 misled voters as to the substance of its impact on existing law. And even if we could consider the entire Voters' Pamphlet when evaluating an article II, section 37 challenge, the Voters' Pamphlet was ambiguous as to whether the effect of I-747 would generally lower the property tax levy limit by one percent or by five percent. We therefore conclude that I-747 violates article II, section 37 of the Washington Constitution. There is no need to reach the question of whether I-747 also violates article II, section 19.
WE CONCUR: SUSAN OWENS, BARBARA A. MADSEN, JJ., STEPHEN M. BROWN, and TERESA C. KULIK, JJ. Pro Tem.
C. JOHNSON, J. (dissenting).
¶ 34 The majority here correctly recognizes the analysis and rules that apply in reviewing an article II, section 37 claim but erroneously concludes those principles were violated by Initiative 747 (I-747). No reasonable argument can be sustained that voters were in any way misled or confused by the effect of I-747, which expressly and was specifically aimed at lowering the tax growth to one percent. The majority seems to suggest that the voters are unable to think or read for themselves, when in fact our democratic process is based on the assumption that voters do in fact read and understand the impact of their votes.
¶ 35 Article II, section 37 of the Washington State Constitution has two primary purposes. The first purpose is to avoid confusion, ambiguity, and uncertainty in statutory law, essentially to disclose the effect of the new legislation. Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 245, 11 P.3d 762 (2000). This first prong of the test is satisfied if the scope of the rights created or affected by the initiative can be ascertained without referring to any other statute or enactment. Citizens for Responsible Wildlife Mgmt. v. State, 149 Wash.2d 622, 642, 71 P.3d 644 (2003). There is no confusion, *497 ambiguity, or uncertainty in this initiative. The ballot title and text clearly disclose the effect of the new legislation to reduce taxes and amend current legislation allowing higher yearly tax increases. The first purpose is thus satisfied.
¶ 36 The second purpose is to ensure that legislators and voters are aware of the impact that an amendatory law will have on existing law. Amalgamated Transit, 142 Wash.2d at 246, 11 P.3d 762. Here, voters were informed there was a previous higher tax, and this amendment reduced that maximum tax to one percent. Whether the former tax cap was six percent or two percent, the voters understood the effect of this law was to reduce the tax, and this is what they voted to approve. Furthermore, the former six percent maximum was specifically referenced in the voters' pamphlet "Policies and Purposes" section, the "Argument For" section, and the statement created by the attorney general. Voters wishing to read only the official ballot title were apprised the effect of the initiative was to reduce taxes to a maximum of one percent increase per year; voters wishing to read further to understand the prior legislation were apprised of both the state of I-722 and the former six percent maximum. Voters were aware the existing law was higher taxes and the impact of this initiative was to reduce taxes, thus fulfilling the second purpose of article II, section 37. I747 satisfies the purposes of article II, section 37 to be clear and inform the voters of the impact of the law.
¶ 37 Although cases exist where the requirements of article II, section 37 were violated because the purpose or effect of the law was confusing, vague, or not contained in the initiative itself,[1] this case is not one of them. The title of I-747 is crystal clear, and the body specifies what laws are being amended and the effect of the amendment. If a voter were to simply read the text of the initiative, the voter would have understood that I-747 reduced the property tax levy limit to one percent. This is not misleading.
WE CONCUR: GERRY L. ALEXANDER, C.J., TOM CHAMBERS, and RICHARD B. SANDERS, JJ.
NOTES
[1] 1000 Friends of Washington is now known as Futurewise.
[2] The language of the ballot title was challenged in superior court. The record of that ballot title challenge is not contained in the record of this case.
[3] I-747 challengers argue that proponents could have asked a court to amend I-747 after signatures were submitted to the secretary of state but before voter approval. Resp'ts' Br. at 28. But the constitutional initiative process encompasses both signature gathering to get a provision on the ballot and a popular vote. WASH. CONST. art. II, § 1(a). Allowing substantive changes to the text of an initiative after signatures have been submitted to the secretary of state risks allowing a version of the initiative onto the ballot that has never fulfilled the signature requirements. Id.; cf. Amalgamated Transit, 142 Wash.2d at 244, 11 P.3d 762 (overturning I-695 in part because it attempted to sidestep the signature requirement for referendums).
[4] I-747's challengers also argue that proponents could have drafted I-747 such that it provided an alternative text if I-722 were declared unconstitutional. Resp'ts' Br. at 27-28 (citing Wash. State Grange v. Locke, 153 Wash.2d 475, 483, 105 P.3d 9 (2005)). The State responds that doing so would create the very kind of voter confusion that article II, section 37 seeks to avoid. Reply Br. of Appellants at 13-14.
[5] The State points to State v. Sam, 85 Wash.2d 713, 538 P.2d 1209 (1975) to support its contention that I-747 met the requirements of article II, section 37 at the time of the popular vote. In Sam, a portion of the original statute was superseded by a later, more specific law. Id. at 715, 538 P.2d 1209. Yet when the legislature amended the original statute, it recited the superseded section in an attempt to comply with article II, section 37. Id. The court's focus in Sam was on whether the recitation of the superseded section evinced intent to revive it. Id. at 715-16, 538 P.2d 1209. Thus, the Sam court did not address the issue presented here. The State also contends that other states allow their legislatures to amend invalid statutes by deleting the portions that courts have deemed unconstitutional. Answer of Appellants to Amici at 11-12. But if necessary, our legislature can repeal a statute entirely and then enact a new law without implicating article II, section 37. Amalgamated Transit, 142 Wash.2d at 254, 11 P.3d 762.
[6] The State also asserts that had the legislature, instead of initiative proponents, attempted to amend I-722, the result would have been the same, and thus, if we agree with the trial court, we could severely frustrate the legislature's ability to amend laws enacted by initiative. Corrected Br. of Appellants at 11 n. 10. However, the Washington Constitution provides that a successful initiative can be amended or repealed by the legislature within two years after its enactment only with a two-thirds vote from each house. Wash. Const. art II, § 1(c). Given this constitutional barrier to the early legislative amendment of initiative-created law, the legislature seems less likely to attempt amendment of an initiative while its constitutionality is still being challenged.
[7] RCW 1.12.025 governs the impact of two or more acts amending the same section during the same legislative session.
[1] See, e.g., Fray v. Spokane County, 85 Wash.App. 150, 931 P.2d 918 (1997); Wash. Educ. Ass'n v. State, 93 Wash.2d 37, 604 P.2d 950 (1980); Weyerhaeuser Co. v. King County, 91 Wash.2d 721, 592 P.2d 1108 (1979).